# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SUZANNE FLANNERY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **C.A. No. 2020-0492-JRS** |
| | ) | |
| GENOMIC HEALTH, INC., JULIAN C. | ) | |
| BAKER, FELIX J. BAKER, FRED E. | ) | |
| COHEN, HENRY J. FUCHS, BARRY P. | ) | |
| FLANNELLY, GINGER L. GRAHAM, | ) | |
| GEOFFREY M. PARKER, KIMBERLY J. | ) | |
| POPOVITS, BAKER BROTHERS LIFE | ) | |
| SCIENCES, L.P., 14159, L.P., 667, L.P., | ) | |
| BAKER BROTHERS INVESTMENTS, | ) | |
| L.P., BAKER BROS. INVESTMENTS II, | ) | |
| L.P., BAKER/TISCH INVESTMENTS, | ) | |
| L.P., EXACT SCIENCES CORP., | ) | |
| SPRING ACQUISITION CORP., and | ) | |
| GOLDMAN SACHS & CO., LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted:  May 18, 2021
Date Decided:  August 16, 2021

Samuel L. Closic, Esquire and Eric J. Juray, Esquire of Prickett, Jones & Elliott, P.A., Wilmington, Delaware and Stephen J. Oddo, Esquire, Gregory E. Del Gaizo, Esquire and Eric M. Carrino, Esquire of Robbins LLP, San Diego, California, Attorneys for Plaintiff Suzanne Flannery.

Robert S. Saunders, Esquire, Stefania A. Rosca, Esquire and Matthew R. Conrad, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware, Attorneys for Defendant Exact Sciences Corp., Spring Acquisition Corp., Genomic Health, Inc., Fred E. Cohen, Henry J. Fuchs, Barry P. Flannelly, Geoffrey M. Parker and Kimberly J. Popovits.

C. Barr Flinn, Esquire, Emily V. Burton, Esquire and Peter J. Artese, Esquire of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware and Douglas A. Rappaport, Esquire and Kaitlin D. Shapiro, Esquire of Akin Gump Strauss Hauer & Feld LLP, New York, New York, Attorneys for Defendants Julian Baker, Felix Baker, 14159, L.P., 667, L.P., Baker Brothers Life Sciences, L.P., Baker Brothers Investments, L.P., Baker Bros. Investments II, L.P. and Baker/Tisch Investments, L.P.

Daniel A. Mason, Esquire and Brendan W. Sullivan, Esquire of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Wilmington, Delaware and Daniel J. Toal, Esquire, Geoffrey Chepiga, Esquire and Caitlin E. Grusauskas, Esquire of Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York, Attorneys for Defendant Goldman Sachs & Co. LLC.

William M. Lafferty, Esquire and Daniel T. Menken, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware and Tariq Mundiya, Esquire of Willkie Farr & Gallagher LLP, New York, New York, Attorneys for Defendant Ginger L. Graham.

**SLIGHTS, Vice Chancellor**

On July 28, 2019, Genomic Health, Inc. ("Genomic" or the "Company") and Exact Sciences Corp. ("Exact") executed an Agreement and Plan of Merger (the "Merger Agreement") whereby Exact acquired Genomic for cash and stock valued, in combination, at $2.8 billion (the "Merger"). The Merger was approved by 79.40% of Genomic stockholders unaffiliated with any party arguably interested in the transaction.

Plaintiff, a stockholder of Genomic at the time of the Merger, alleges that the process leading to the Merger was riddled with defects, including the undue influence of conflicted controlling stockholders, and that the defects resulted in a fundamentally unfair price for Genomic stockholders. She has sued the alleged controllers and members of the Genomic board of directors (the "Board") for breach of fiduciary duty, and has sued Genomic's financial advisor, Goldman Sachs & Co. ("Goldman"), and Exact for aiding and abetting. She also alleges the Merger was defective as a matter of statute. All Defendants now move to dismiss.

Plaintiff's Verified Amended Complaint, filed on November 23, 2020, comprises six counts.[1] Count I asserts the Baker Brothers Entities (later defined), which together are purportedly the controlling stockholders of Genomic, along with Exact and Genomic, violated Section 203 of the Delaware General Corporation Law

---

[1] D.I. 38.

("Section 203") because the Baker Brothers Entities separately agreed to sell their greater than 15% stake in Genomic to Exact prior to the Merger.[2] Count II asserts a claim for conversion against Genomic, Exact and Spring Acquisition Corp., principally based on the supposition that the Merger violated Section 203. Count III asserts claims for breach of fiduciary duty against all individual defendants, in their capacities as directors of Genomic, and Kimberly Popovits, the then-CEO of Genomic, in her capacity as officer. Count IV asserts a claim for breach of fiduciary duty against the Baker Brothers Entities in their capacity as the controlling stockholders of Genomic. Finally, Counts V and VI assert claims for aiding and abetting against Goldman and Exact, respectively, for their roles in facilitating the breaches of fiduciary duty alleged in Counts III and IV.

Defendants have moved to dismiss the Complaint under Chancery Rule 12(b)(6) for failure to state viable claims.[3] After careful consideration, I am satisfied the motions must be granted. Plaintiff's Section 203 claim fails because it is clear from properly incorporated documents that the Baker Brothers Entities did not agree to vote for the Merger or otherwise sell their shares to Genomic until after the Board executed the Merger Agreement. As for the Baker Brothers Entities'

---

[2] 8 *Del. C.* § 203.

[3] D.I. 43–45.

2

alleged status as a conflicted controlling stockholder, the Complaint does not well plead that these minority blockholders were conflicted controllers, either with respect to Genomic generally or the process leading to the Merger specifically. Nor has Plaintiff well pled any other basis to trigger entire fairness review. As to the claims against each individual defendant as members of the Board, while Plaintiff argues for the application of enhanced scrutiny under *Revlon*, that standard of review does not apply as a matter of law because the Merger was not a change-of-control transaction.[4] Even if *Revlon* did apply, the Complaint fails to well plead non-exculpated claims against each director. As to the claims against Popovits in her capacity as an officer, the Complaint fails to well plead either that she was conflicted, implicating her duty of loyalty, or that she acted with gross negligence at any time during the negotiation process, implicating her duty of care. Finally, because Plaintiff has failed to state breach of fiduciary duty claims, she likewise has failed to state claims for aiding and abetting breaches of fiduciary duty. My reasoning follows.

## I. BACKGROUND

I have drawn the facts from well-pled allegations in the Verified Amended Complaint (the "Complaint") and documents incorporated by reference or integral

---

[4] *Revlon v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173 (Del. 1986).

3

to that pleading.[5] For purposes of the motion, I accept as true the Complaint's well-pled factual allegations and draw all reasonable inferences in Plaintiff's favor.[6]

## A. The Parties

Plaintiff, Suzanne Flannery, was a Genomic stockholder at all relevant times during the period of alleged wrongdoing through the Merger.[7]

Defendant, Genomic, a Delaware corporation prior to the Merger, was a global provider of genomic-based diagnostic tests.[8] Defendant, Exact, also a Delaware corporation, is a molecular diagnostics company.[9] At the time of the Merger, Exact had no affiliation with Genomic or any of Genomic's stockholders. Defendant, Spring Acquisition Corp., is a wholly-owned subsidiary of Exact and

---

[5] Verified Am. Compl. ("Compl.") (D.I. 38); *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting that on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint). As discussed below, Plaintiff received documents in response to her demand for inspection under 8 *Del. C.* § 220 that she has incorporated by reference in the Complaint (the "Section 220 Documents"). Compl. ¶¶ 152–56.

[6] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

[7] Compl. ¶ 12.

[8] Compl. ¶ 13.

[9] Compl. ¶ 27.

was formed to facilitate the Merger.[10]  Genomic was the surviving company in the Merger and became a wholly-owned subsidiary of Exact.[11]

Defendants, Baker Brothers Life Sciences, L.P., 14159, L.P., 667, L.P., Baker Brothers Investments, L.P., Baker Bros. Investments II, L.P., and Baker/Tisch Investments, L.P. (together the "Baker Brothers Entities"), all Delaware limited partnerships, were each significant Genomic stockholders as of the Merger, and each "irrevocably and unconditionally" agreed to vote in favor of the Merger under a July 28, 2019 voting agreement with Exact (the "Voting Agreement").[12]  The Baker Brothers Entities are controlled by Julian Baker and Felix Baker.[13]

Defendant, Julian Baker, served on the Board from 2001 until the Merger in 2019.[14]  Julian Baker co-founded and manages Defendant, Baker Brothers Advisors, LP, along with his brother Felix Baker, also a Defendant in this action.[15]  From 2009 until the Merger, Julian Baker served on Genomic's Nominating and

---

[10] Compl. ¶ 28.

[11] *Id.*

[12] Compl. ¶¶ 29–34.  Aside from the Voting Agreement, there is no allegation that the Baker Brothers Entities had any relationship with Exact prior to the Merger.

[13] Compl. ¶ 2.

[14] Compl. ¶ 14.

[15] *Id.*

Corporate Governance Committee.[16] He also serves on a number of public company boards, including Incyte Corporation, where he has served as a director since 2001.[17]

Defendant, Felix Baker, served on the Board from 2012 to 2019 and, like his brother, founded Baker Brothers Advisors, LP.[18] He too serves on various public company boards, including Kiniksa Pharmaceuticals, Ltd.[19]

Defendant, Kimberly Popovits, became a member of the Board in 2002, the CEO of Genomic in 2009 and chairman of the Board in March 2012.[20] She continued to serve as CEO and chairman until the Merger.[21] Ms. Popovits also serves on the Kiniksa board of directors.[22]

Defendant, Barry Flannelly, was elected to the Board on January 29, 2019, and served through the Merger.[23] His nomination was recommended by Julian Baker as a result of his work as Executive Vice President and General

---

[16] *Id.*

[17] *Id.*

[18] Compl. ¶ 15.

[19] *Id.*

[20] Compl. ¶ 16.

[21] *Id.*

[22] *Id.*

[23] Compl. ¶ 17.

Manager of Incyte, a position he has occupied since 2014.[24] The Baker Brothers Entities are Incyte's largest stockholder, owning approximately 15% of the shares outstanding.[25] As noted, Julian Baker has served on the Incyte board since 2001.[26]

Defendant, Geoffrey M. Parker, upon the recommendation of the Baker Brothers Entities, served on the Board from June 21, 2016 until the Merger.[27] As with Flannelly, the Baker Brothers Entities knew Parker from their investments in other companies. Flannelly served as Anacor Pharmaceuticals, Inc.'s CFO until mid-2015 and consulted for Anacor for a period thereafter, all while the Baker Brothers Entities owned 5% of Anacor.[28] The Baker Brothers Entities also crossed paths with Parker at Tricida, Inc., where Parker currently works as an executive vice president, ChemCentryx, Inc., where Parker has served as a director since 2009, and Sunesis Pharmaceuticals, Inc., where Parker served as a director from 2016 to 2017.[29]

---

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] Compl. ¶ 19.

[28] *Id.*

[29] *Id.*

Defendant, Fred E. Cohen, served on the Board from 2002 until the Merger.[30] As founder and managing director of Vida Ventures, Cohen has a long history of investing alongside the Baker Brothers Entities.[31]

Defendant, Henry J. Fuchs, served on the Board from 2013 until the Merger.[32] He served on Genomic's Nominating and Corporate Governance Committee with Julian Baker and serves as the President of Worldwide Research at BioMarin Pharmaceutical, a company in which the Baker Brothers Entities have been investors since March 2006.[33] The Baker Brothers Entities nominated Fuchs as one of eight nominees to the board of directors at AnorMED, Inc. and, it can be inferred, given the timing, that Fuchs was also appointed by the Baker Brothers Entities to the Mirati Therapeutics board of directors.[34]

---

[30] Compl. ¶ 20.

[31] *Id.*

[32] Compl. ¶ 21.

[33] *Id.*

[34] Compl. ¶ 23.

8

Defendant, Ginger L. Graham, served on the Board from 2009 until the Merger.[35] She joined the Clovis Oncology, Inc. board of directors in 2013, a year after the Baker Brothers Entities began investing in Clovis.[36]

Defendants, Julian Baker, Felix Baker, Flannelly, Parker, Cohen, Graham, Fuchs and Popovits, are collectively referred to as the "Individual Defendants."

Defendant, Goldman, a New York LLC, served as a financial advisor to the Board at various times throughout the relevant time period.[37]

**B. The Baker Brothers Entities' Relationship with Genomic**

Julian Baker, a founder and controller of the Baker Brothers Entities, joined the Board in 2001.[38] In September 2006, the Baker Brothers Entities disclosed their beneficial ownership of 6.1% of the outstanding shares in Genomic.[39] By May 2007, the Baker Brothers Entities had accumulated a roughly 18% stake in the Company.[40] That stake increased to 23% by August 2010.[41]

---

[35] Compl. ¶ 24.

[36] *Id.*

[37] Compl. ¶ 26.

[38] Compl. ¶ 14.

[39] Compl. ¶ 35.

[40] Compl. ¶¶ 3, 36.

[41] Compl. ¶ 36.

Felix Baker, the other half of the "Baker Brothers," joined the Board in 2012.[42] Between August 2010 and June 2013, the Baker Brothers Entities continued to increase their stake in the Company, topping out at 45.8%.[43]

On February 13, 2013, the Baker Brothers Entities disclosed in a Schedule 13D that they intended to engage in mutual discussions with Genomic regarding a potential sale of the Company but clarified they did not then "have any plans or proposals with respect to any extraordinary corporate transaction."[44] In June 2013, the Baker Brothers Entities stopped acquiring Genomic's stock.[45]

In August 2016, Genomic and the Baker Brothers Entities entered into a registration rights agreement ("RRA") whereby, if demanded by the Baker Brothers Entities, Genomic would register the Baker Brothers Entities' shares for resale.[46] Given how low Genomic's stock was trading in the months following the RRA, a price substantially lower than the prevailing price in 2013 when the Baker Brothers Entities last acquired Company shares, the parties to the RRA understood it was

---

[42] Compl. ¶ 38.

[43] Compl. ¶¶ 39, 43.

[44] Compl. ¶ 41.

[45] Compl. ¶ 44.

[46] Compl. ¶ 45.

unlikely the Baker Brothers Entities would exercise their rights under the RRA any time soon.[47]

By October 2017, the Board had determined that it was appropriate to consider strategic alternatives for the Company, including a sale.[48] Goldman was engaged as the Company's financial advisor and, in that capacity, it contacted 27 potential suitors, convincing 16 (including Exact) to enter into confidentiality agreements.[49] Of the 16, only 2 followed with preliminary indications of interest and none offered more definitive indications of interest.[50]

In early-to-mid 2018, Genomic began to report more promising results, and with promising results came rising stock prices.[51] As the stock price rose, the Baker Brothers Entities began to sell off their stake in the Company.[52] By April 12, 2019,

---

[47] Compl. ¶¶ 46–47.

[48] Compl. ¶ 48.

[49] Compl. ¶ 56.

[50] Compl. ¶¶ 57–58.

[51] Compl. ¶ 59 ("On June 3, 2018, Genomic announced positive results from a cancer detection study."); Compl. ¶ 61 ("Popovits also announced that Genomic's Board was raising our full year 2018 guidance and expect to deliver more than 17 percent revenue growth for the year." (internal quotations omitted)); *id.* (noting that Genomic reported that it "continue[d] to deliver record results" and would be "raising [its] full year 2018 guidance . . .").

[52] Compl. ¶ 62 (charting the Baker Brothers Entities' stock sales and resulting negative effects on Genomic's stock price).

after an aggressive six-month selloff, the Baker Brothers Entities were left with a 25.9% stake in Genomic.[53]

## C. The 2019 Sale Discussions

On June 11, 2019, Kevin Conroy, Exact's CEO, contacted Popovits "out of the blue" to discuss a potential combination.[54] The parties executed an NDA in short order, and on June 13, Conroy submitted to Popovits a non-binding proposal to acquire Genomic for $64 per share, comprising 20% cash and 80% Exact stock.[55] Prior to informing the full Board, Popovits instructed Goldman to perform an analysis of Exact's proposal.[56] Before doing so, she made no effort to solicit or interview other banks to take on the assignment.[57]

At a June 17 Board meeting, the Board considered Exact's proposal and concluded that Exact needed to offer more cash given that Exact's stock was trading at historically high levels.[58] This Board discussion is not mentioned in the Definitive

---

[53] Compl. ¶¶ 62–63.

[54] Compl. ¶ 64; Exact and Genomic Defs.' Opening Br. in Supp. of Mot. to Dismiss Pl.'s Verified Am. Compl. ("Genomic OB") (D.I. 49), Ex. 1 ("Proxy") at 46.

[55] Compl. ¶¶ 65–67.

[56] Compl. ¶ 67.

[57] *Id.*

[58] Compl. ¶ 70.

Proxy Statement related to the Merger (the "Proxy").[59] After Goldman reviewed the unsuccessful 2017–2018 process with the Board, and the specifics of Exact's pending offer, the Board instructed Popovits to inform Exact that its bid was inadequate.[60] Popovits did as instructed and, on June 19, Conroy returned with a $68 per share offer, again comprised of a mix of cash and stock.[61] According to the Proxy, Popovits reported this offer to the Board the same day.[62] On June 24, without express Board authorization or approval, Popovits met with Exact's financial advisors to discuss the latest offer and informed them of Genomic's "double digit growth projections over the next 5 years."[63]

On June 25, Exact sent a $70 per share offer, comprised of 30% cash and 70% stock, which Popovits presented to the Board on June 26.[64] Bartosz Ostenda, a banker from Goldman, was the only financial advisor present at the June 26

---

[59] *Id.*

[60] *Id.*

[61] Compl. ¶ 72.

[62] *Id.*; Proxy at 47. Plaintiff alleges there is no evidence in the Section 220 Documents that Popovits reported the updated Exact offer to the Board on June 19. Instead, the documents reveal the report to the Board was made on June 24. Compl. ¶ 72.

[63] Compl. ¶ 74.

[64] Compl. ¶ 75.

meeting.[65]   The Board asked Ostenda to prepare two separate analyses, one of Genomic as a standalone company and the other as a combined company with Exact.[66]

On June 27, Exact made a presentation to the Board in support of its offer.[67] When the Exact representatives left the meeting, the Board asked Goldman to request that Exact provide its internal financial projections.[68]  When Goldman later made the request, Exact declined to provide any projections, citing its fear that a release of this information might require it to make a public disclosure of its interest in acquiring Genomic, something it was not willing to do at that time.[69]  Ostenda relayed Exact's response to the Board at a July 1 meeting.[70]  At that meeting, Ostenda also informed the Board of: "(i) Wall Street research and diligence commentary, (ii) Genomic's projections for Exact, and (iii) Wall Street projections."[71]  Ostenda advised the Board that Exact would not likely make another offer without a

---

[65] *Id.*

[66] *Id.*

[67] Compl. ¶ 76.

[68] Compl. ¶ 77.

[69] Compl. ¶ 78.

[70] Compl. ¶ 80.  The Proxy did not disclose Exact's precise reasons for not providing the financial projections.  Compl. ¶ 79.

[71] Compl. ¶ 80 (internal quotations omitted).

counterproposal.[72]  Notwithstanding that it had no evidence of Exact's projected cash flows, the Board agreed to make a counterproposal of $80 per share, comprised of 35% cash and 65% stock.[73]

Also at the July 1 meeting, the Board considered whether to propose a collar on the stock portion of the deal in the event the trading price of Exact's common stock declined after the parties struck the deal but before closing.[74]  In proposing the collar to Exact later that day, the Board ignored that Exact's stock was trading at an all-time high and that the price was likely to decrease in the future.[75]  And the Board made its proposal without any sense of Exact's future cash flows.[76]

Conroy rejected Genomic's July 1 counterproposal on the spot.[77]  In response, Genomic called a special Board meeting on July 2 and agreed to reduce its counter by $5 per share, with 33.33% comprised of cash.[78]  On July 5, Centerview Partners,

---

[72] *Id.*

[73] *Id.*

[74] Compl. ¶ 82.  Although unclear, it appears the Board was considering a "two-way collar" at this point, meaning a collar with a low-end and a high-end.  That structure certainly was under consideration later in the negotiations.  Compl. ¶ 87.

[75] Compl. ¶ 82.

[76] *Id.*

[77] Compl. ¶ 83.

[78] Compl. ¶ 84.

Exact's financial advisor, reported that Exact would not accept Genomic's July 2 counter and likely would not make another bid.[79] Popovits and Conroy kept talking, however, leading to Conroy agreeing to sweeten Exact's offer by increasing the cash component from 30% to 35%.[80] On July 6, the Board discussed the latest Exact proposal with a focus on the collar, and determined "that the lower bound of the two-way collar should be set at an Exact [] stock price of $90.00 per share."[81] Once again, however, the Board failed to take into account the fact that Exact's stock price had peaked and failed to acknowledge that it still lacked any meaningful insight into Exact's projections.[82]

On July 8, the Board met to discuss Exact's most recent offer, which the Proxy described as $72 per share, comprised of $27.50 in cash and $44.50 in stock.[83] This was the first meeting that Genomic's outside counsel, Pillsbury Winthrop Shaw

---

[79] Compl. ¶ 85.

[80] Compl. ¶ 86. Plaintiff suggests that Exact, at some point, had increased its 30% cash offer before increasing it again to 35%. Compl. ¶ 86 (suggesting that Exact increased its offer by 1.7% to reach 35% cash). But the Complaint's only reference to a cash component above 30% is its reference to Genomic decreasing its counter from 35% to 33% cash. Compl. ¶ 84.

[81] Compl. ¶ 87.

[82] *Id.*

[83] Compl. ¶¶ 88–89.

Pittman LLP, attended.[84]  At this point, the meeting minutes and Proxy separate, with the meeting minutes indicating the Board was not prepared to accept the $72 per share offer, while the Proxy states that, as of July 8, the Board found the $72 per share acceptable.[85]  It is undisputed, however, that, on the next day, Genomic hired Sullivan & Cromwell as additional counsel to guide the Board through the potential transaction.[86]

## D. Goldman's Alleged Conflicts

Immediately prior to a July 18, 2019 Board meeting, the Board was informed for the first time that Ostenda was a member of the Goldman investment division team that had performed work for Exact before Merger discussions had commenced.[87]  Goldman assured Genomic that Ostenda had not and would not work for Exact while discussions regarding a potential transaction were ongoing.[88]  Prior

---

[84] Compl. ¶ 88.

[85] Compl. ¶ 89; Proxy at 50.  According to the Complaint, the minutes reflect that the Board would not accept Exact's most recent offer but "'indicated that a 10% up and down collar mechanism would be acceptable provided that' the measurement periods be worked out." Compl. ¶ 89.

[86] Compl. ¶ 90; Proxy at 51.

[87] Compl. ¶¶ 91–92.  According to the disclosure document provided to the Board, Goldman advised that, "in the past two years, our Investment Banking Division has not performed any financial advisory and/or underwriting services for any Relevant Party and Significant Shareholder of any of their respective affiliates."  Genomic OB, Ex. 13 ("Goldman Conflicts Letter").

[88] Compl. ¶ 92.

17

to Goldman's commitment in this regard, Ostenda had advised Genomic during the 2017 sale process, attended every 2019 Board meeting concerning the potential Merger, sometimes as Goldman's only representative, and presented at length to the Board in most meetings.[89] And, prior to the disclosure, the Board had already agreed on Merger price.[90]

## E. The Voting Agreement and Signing of the Merger Agreement

On July 18, Exact's counsel, Skadden, Arps, Slate, Meagher & Flom LLP, demanded that the Baker Brothers Entities enter into a voting agreement and vote their stock in favor of a future transaction.[91] Five days later, on July 23, the S&P Dow Jones Indices announced Genomic would be listed on the S&P SmallCap 600 before July 29, causing an immediate 15% increase in the share price to $65.22.[92] The Board met on July 26 and recognized the increase in Genomic's trading price, but chose not to capitalize on the news by repricing the deal, apparently because it had already verbally agreed to a price on July 9.[93]

---

[89] Compl. ¶ 93.

[90] Compl. ¶ 96.

[91] Compl. ¶ 99.

[92] Compl. ¶ 100.

[93] Compl. ¶ 101.

Also on July 26, Popovits sent an email to the Board in which she expressed that Exact expected Genomic to move forward with the Merger promptly notwithstanding the recent spike in Genomic's stock price.[94] On that same day, negotiations between the Baker Brothers Entities and Exact over the form of the voting agreement broke down when the Baker Brothers Entities refused to agree to trading restrictions. Even though negotiations had ceased, counsel for the Baker Brothers Entities advised Exact that the Baker Brothers Entities still intended to vote in favor of the transaction.[95] Fueled by reports in Bloomberg News that Genomic and Exact were discussing a possible combination, on July 27, Exact again wrote to Genomic urging that the Board move swiftly toward closing.[96] Exact then agreed to honor the terms of Genomic's proposed collar in the spirit of moving the deal along.[97]

---

[94] Compl. ¶ 102.

[95] Compl. ¶ 103.

[96] Compl. ¶ 104. It is alleged that Exact was the source of the leak that prompted Bloomberg's report of a possible merger. *Id.*

[97] Compl. ¶ 105. The final collar that was agreed to in the Merger Agreement provided that, "based on the weighted trading price for the 15 days preceding the Merger closing, if Exact['s] [] weighted average stock price was equal to or less than $98.79, the exchange ratio was fixed at 0.45043 Exact [] shares." Compl. ¶ 120. After signing but before closing, the stock price rose but subsequently dropped below the collar, with a closing price of $79.95 on the day of the stockholder vote and $83.66 on the day the Merger closed, meaning the Merger consideration was fixed at closing at $65.18 per Genomic share. Compl. ¶¶ 120–24. This per share consideration was less than the unaffected price the day before the announcement of the Merger. Compl. ¶ 100.

The Board convened on July 28 and approved the Merger, resulting in consideration reflecting a 5% premium over the then current trading price.[98] On the same day, the Baker Brothers Entities entered into the Voting Agreement with Exact in which they committed to vote in favor of the Merger.[99] On October 4, 2019, the Board filed the Proxy with the SEC,[100] and the Merger was approved by a stockholder vote on November 7, 2019.[101]

## II. ANALYSIS

The standard for deciding a motion to dismiss under Court of Chancery Rule 12(b)(6) is well-settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[102]

---

[98] Compl. ¶ 106.

[99] Compl. ¶ 29.

[100] Compl. ¶ 11.

[101] Compl. ¶ 159; Genomic OB, Ex. 18 (reflecting that holders of 84.56% of Genomic's outstanding shares voted in favor of the Merger, and excluding the Baker Brothers Entities, 79.40% of outstanding shares voted in favor).

[102] *Savor*, 812 A.2d at 896–97 (citation omitted).

Applying this standard, I approach the analysis in a now-familiar sequence.[103] First, I briefly address Plaintiff's concerns that Defendants have improperly relied upon documents not incorporated within or integral to the Complaint in support of their motions to dismiss and conclude that, even when the disputed documents are removed from consideration, the Complaint still fails to state viable claims. Second, I address the claim that the Merger violated Section 203 and conclude that no statutory violation occurred, thereby resulting in dismissal of both Count I and the related conversion claim in Count II. Third, I address the breach of fiduciary duty claims against the Baker Brothers Entities and the Individual Defendants and conclude: (a) entire fairness does not apply because the Complaint does not well plead that the Baker Brothers Entities were conflicted controlling stockholders as of the Merger or that any other fiduciary was burdened by conflicts of interest; (b) *Revlon* either does not apply as a matter of law or Plaintiff has not stated a non-exculpated claim for breach of fiduciary duty when considered under *Revlon* enhanced scrutiny; (c) Plaintiff fails to well plead bad faith violations of the Defendants' duty of disclosure and, based on the foregoing; (d) the business judgment rule applies and, without any allegation of waste, the claims against the

---

[103] *See In re GGP, Inc. S'holder Litig.*, 2021 WL 2102326, at *3 (Del. Ch. May 25, 2021) (noting that the resolution of motions to dismiss post-closing stockholder challenges to mergers has taken on a recurring and now-familiar cadence).

Genomic fiduciaries must be dismissed.  Fourth, I take up the claim that Genomic's

CEO, Kim Popovits, is separately liable for breach of fiduciary duty and, again, find

that claim lacking in any legal or factual support, even after affording Plaintiff all

reasonable inferences.  And finally, I briefly address Plaintiff's aiding and abetting

claims and conclude they must be dismissed for failure to well plead a predicate

breach of fiduciary duty.

## A. Defendants' Reliance on "Incorporated" Documents

As noted, prior to filing her Complaint, Plaintiff made a demand to inspect

documents under Section 220.  As a condition to receiving documents in response

to her demand, Plaintiff agreed that if she filed any action that incorporated

"Section 220 Material" into her Complaint, "the entire production of Section 220

Materials [would be] incorporated by reference in any such filing, as provided by

Delaware law."[104]  Based on this agreement, Defendants now maintain they may

incorporate any portion of any document that Plaintiff cited in the Complaint for any

---

[104] Genomic OB, Ex. 2, ¶ 2(g).  This type of agreement, when properly implemented, "serves the laudable purpose of eliminating the need for parties and the court to address whether referring to Section 220 documents has converted a motion to dismiss into a motion for summary judgment."  *In re Clovis Oncology, Inc. Deriv. Litig.*, 2019 WL 4850188, at *14 n.216 (Del. Ch. Oct. 1, 2019) (citation omitted); *see also Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016) (confirming parties can agree that Section 220 documents are deemed incorporated by reference in the complaint without altering the Rule 12(b)(6) standard of review).

purpose that suits them in the prosecution of their motions.[105] Defendants, in fact, take it a step further, and argue that the negotiated language in the Section 220 confidentiality agreement gives them *carte blanche* to cite to *any* Section 220 document, whether cited in the Complaint or not, to be used for any purpose, even at the motion to dismiss stage.[106] In my view, that is not a correct characterization of the state of our law.

When parties agree that a document, or in this case, the "entire [Section 220] production," is "incorporated by reference," their agreement "does not enable a court to weigh evidence on a motion to dismiss. [Instead,] [i]t permits a court to review the actual documents to ensure that the plaintiff has not misrepresented their contents and that any inference the plaintiff seeks to have drawn is a reasonable one."[107]

Here, the Baker Brothers Entities submitted 19 exhibits, the Genomic defendants submitted 22 exhibits and Goldman submitted 12 exhibits (including, in all, 19 Section 220 Documents). Although Defendants frequently proffer the documents for the proper purpose of questioning inferences Plaintiff would have the

---

[105] *In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at *18 (Del. Ch. Jan. 27, 2021), as corrected (Feb. 4, 2021); *Clovis*, 2019 WL 4850188, at *14 n.216; *Acero Cap., L.P. v. Swrve Mobile, Inc.*, 2021 WL 2207197 (Del. Ch. June 1, 2021).

[106] Telephonic Oral Arg. on Defs.' Mot. to Dismiss (D.I. 93) at 13–14.

[107] *Voigt v. Metcalf*, 2020 WL 614999, at *9 (Del. Ch. Feb. 10, 2020).

23

Court draw from the documents, in some instances, Defendants rely on documents for the sake of rewriting the Complaint "in favor of their own version of events with documents drafted at a time when litigation relating to their contents was likely."[108] That is not how our Chancery Rule 12(b)(6) operates.[109] When a defendant submits matters outside of the complaint on a motion to dismiss, and then seeks to use those documents for an improper purpose, "the court may either exclude the extraneous matter from its consideration or convert the Chancery Rule 12(b)(6) motion into a motion for summary judgment. . . ."[110]

After due consideration, I am satisfied there is no need to convert here. As explained below, it is clear from the content within the four corners of the Complaint, and the documents *Plaintiff* has incorporated by reference, that Plaintiff has failed to state viable claims. Any improper references Defendants would have me draw from extraneous matter will be disregarded.

---

[108] *CBS*, 2021 WL 268779, at *18.

[109] *Id.* (noting parties may not, by agreement, opt out of this court's rules of procedure and impose on the court an altered procedural standard of review that is the creature of their own preferences).

[110] *Id.*

## B. The Section 203 and Conversion Claims

Plaintiff contends that Defendants violated Section 203 because Exact entered into a business combination with Genomic two days after Exact became an interested stockholder. Section 203, in relevant part, provides:

> (a) Notwithstanding any other provisions of this chapter, a corporation shall not engage in any business combination with any *interested stockholder* for a period of 3 years following the time that such stockholder became an interested stockholder, unless:

> > (1) Prior to such time the board of directors of the corporation approved either the business combination or the transaction which resulted in the stockholder becoming an interested stockholder;
> > . . .

> > (3) At or subsequent to such time the business combination is approved by the board of directors and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least 66 2/3% of the outstanding voting stock which is not owned by the interested stockholder.[111]

An *interested stockholder* is defined as one who "is the *owner* of 15% or more of the outstanding voting stock of the corporation."[112] An *owner*, in turn, is defined, in relevant part, as:

> [A] person that individually or with or through any of its affiliates or associates:

> > (i) Beneficially owns such stock, directly or indirectly; or . . .
> > (iii) Has any agreement, arrangement or understanding for the

---

[111] 8 *Del. C.* § 203(a) (emphasis added).

[112] 8 *Del. C.* § 203(c)(5) (emphasis added).

purpose of acquiring, holding, voting . . . , or disposing of such stock with any other person that beneficially owns, or whose affiliates or associates beneficially own, directly or indirectly, such stock.[113]

Plaintiff claims Exact became an interested stockholder of Genomic on July 26, two days prior to the Board signing the Merger Agreement, when the Baker Brothers Entities allegedly agreed to vote their shares in favor of the transaction. Defendants disagree and argue Plaintiff's Section 203 claim fails for three reasons: (1) Exact never became an "Interested Stockholder" because the Baker Brothers Entities did not agree with Exact to vote in favor of the Merger until after the Board approved the Merger (when the Voting Agreement was actually executed), (2) the Board implicitly approved the Voting Agreement prior to July 26, the date Plaintiff claims the two sides came to an agreement, and (3) a majority of disinterested shares approved the transaction. Because I agree with Defendants, at a minimum, on their first two proffered bases to defeat the claim, I need not address the more fact-intensive inquiry as relates to the stockholder vote.

### 1. Exact Was Not an Interested Stockholder Prior to the Merger

I begin with an acknowledgment that the Baker Brothers Entities themselves meet the definition of Interested Stockholder as the beneficial owners of

---

[113] 8 *Del. C.* § 203(c)(9).

approximately 25% of Genomic's stock at the time of the Merger.[114] Plaintiff argues that Exact became an "owner of 15% or more of [Genomic's] outstanding voting stock," and thus an Interested Stockholder, when the Baker Brothers Entities, as Interested Stockholders, allegedly committed to Exact on July 26 to vote in favor of the Merger.[115] To support this allegation, Plaintiff points to the Proxy, which states that on July 26 "representatives of Akin Gump contacted representatives of Skadden to inform them that the [Baker Brothers Entities] were no longer willing to agree to transfer restrictions on their shares between signing and closing, but would still agree to vote in favor of the transaction."[116] This, according to Plaintiff, evidences an "agreement, arrangement or understanding for the purpose of acquiring . . . such stock," in violation of Section 203.[117] That is not a reasonable inference to draw from the Proxy.

For parties to form an agreement, there must be a meeting of the minds.[118] This court has defined "agreement" to mean "a factual conclusion that two (or more)

---

[114] Compl. ¶¶ 3, 129, 182–85; *see also* 8 *Del. C.* § 203(c)(9)(i) (providing that an interested stockholder includes a stockholder that "[b]eneficially owns such stock, directly or indirectly").

[115] 8 *Del. C.* § 203(c)(5).

[116] Proxy at 54; Compl. ¶ 103.

[117] 8 *Del. C.* § 203(c)(9)(iii).

[118] *Chesapeake Corp. v. Shore*, 771 A.2d 293, 353 (Del. Ch. 2000) ("'[A]greement,' 'arrangement,' or 'understanding' . . . presupposes a meeting of the minds.").

27

minds have come mutually to accept one or more terms of a proposed contract."[119] "Contract" is defined as "a legal conclusion that the parties have reached agreement with respect to all of the material items they seek to negotiate and have expressed an intention to bind themselves to perform the promised acts."[120]  Section 203's reference to "agreement, arrangement or understanding," when read against this backdrop, is reasonably construed, in broad terms, to mean "all arrangements, whether formal or informal, written or unwritten."[121]

The Proxy's language does not evidence either a formal or informal meeting of the minds between the Baker Brothers Entities and Exact on July 26.  In fact, the Proxy discloses that the Baker Brothers Entities had plainly *rejected* Exact's proposed voting agreement and that they would only agree to a voting agreement with different terms.[122]  It is simply not reasonable to read the Proxy to say that the Baker Brothers Entities fully and unconditionally agreed to vote their shares in favor of the Merger, either formally or informally.  That interpretation of the events of July 26 ignores the unambiguous qualifiers (including that there would be no support

---

[119] *Transamerican S.S. Corp. v. Murphy*, 1989 WL 12181, at *1 n.1 (Del. Ch. Feb. 14, 1989); *see also Siegman v. Columbia Pictures Entm't, Inc.*, 576 A.2d 625, 631 (Del. Ch. 1989) (using the definition of agreement in construing Section 203).

[120] *Transamerican*, 1989 WL 12181, at *1 n.1.

[121] *Siegman*, 576 A.2d at 632 (citation omitted).

[122] Proxy at 54; Compl. ¶ 103.

for the Merger if Exact continued to insist on transfer restrictions), the presence of which wipes out the notion that an agreement existed in the first instance.[123] That the Baker Brothers expressed their then-present, non-binding intent eventually to support the Merger does not change the analysis. Without an agreement, Exact cannot conceivably be classified as an Interested Stockholder and thus cannot have violated Section 203. This is further bolstered by the existence of the later-executed Voting Agreement, entered into immediately *after* the Board approved and executed the Merger Agreement.[124] That agreement, entirely proper under our law, evidences nothing more than the commonplace scenario where a large stockholder agrees to vote its shares in favor of a transaction approved and authorized by the board of the target company.[125]

2. **The Board Implicitly Approved the Voting Agreement Prior to Its Consummation and Prior to Executing the Merger Agreement**

Section 203(a) permits an Interested Stockholder to engage in a business combination transaction so long as "the board of directors of the corporation [previously] approved either the business combination or the transaction which

---

[123] Proxy at 54 ("[T]he [Baker Brothers Entities] were no longer willing to agree to transfer restrictions . . . .").

[124] Compl. ¶ 29.

[125] *Siegman*, 576 A.2d at 632 (holding that an option agreement, executed on the same day but after a merger agreement, did not create a Section 203 problem because the interestedness only arose after the transaction was approved by the board).

resulted in the stockholder becoming an interested stockholder."[126] Plaintiff argues that because the Board did not approve either the Merger or the Voting Agreement prior to July 26, the date the Baker Brothers Entities allegedly agreed to vote in favor of the transaction, Section 203(a)'s safe harbor is not implicated.[127] But the Complaint lacks any allegations that the Board was unaware that a Voting Agreement was being contemplated between the Baker Brothers Entities and Exact, much less that the Board disapproved of Exact's desire to secure the Baker Brothers Entities' commitment to the Merger. In fact, as the Complaint makes clear through its incorporation of the Proxy, on July 16, Exact's counsel sent a draft merger agreement to Genomic's counsel that expressly contemplated Exact would enter into certain voting agreements with Genomic stockholders.[128] The only reasonable inference is that the Board well understood Exact would require voting agreements in connection with the Merger.[129] By continuing to negotiate with Exact on those terms, the Board demonstrated its agreement to the unremarkable proposition that Exact would seek to secure the commitment of Genomic's largest stockholder to the

---

[126] 8 *Del. C.* § 203(a)(1).

[127] Pl.'s Corrected Answering Br. in Opp'n to Defs.' Mot. to Dismiss Pl.'s Verified Am. Compl. ("AB") (D.I. 69) at 40–41.

[128] Compl. ¶ 133; Proxy at 52.

[129] Proxy at 55.

Merger prior to the stockholder vote. That agreement to "the transaction which resulted in [Exact] becoming an Interested Stockholder," prior to the parties themselves agreeing, excepts the transaction from Section 203's proscriptions.[130]

This court's decision in *Matador Capital Management Corp. v. BRC Holdings, Inc.* is instructive by way of analogy.[131] There, the court considered "a transaction negotiated by the [target] board in which [the alleged interested stockholder's] agreement to tender was given as an accommodation to the [target] board in order to satisfy one of [the acquiror's] demands on it."[132] The plaintiff alleged the transaction violated Section 203 and sought a preliminary injunction to prevent the closing.[133] The court held that any potential Section 203 violation was put to rest by the clear evidence that the target board acknowledged and discussed the voting agreement, creating a reasonable inference that the target board in fact consented to the voting agreement when it continued to negotiate with the buyer without raising any concerns regarding the voting agreement.[134] Similarly, here, the

---

[130] 8 *Del. C.* § 203(a)(1).

[131] 729 A.2d 280, 299 (Del. Ch. 1998).

[132] *Id.*

[133] *Id.* The procedural posture in *Matador* flags another issue; post-closing challenges to mergers under Section 203 are awkward affairs as the remedy is difficult to conceive much less implement.

[134] *Id.*

Complaint and documents properly incorporated by reference reveal that the Board acknowledged Exact would require a voting agreement from the Baker Brothers Entities before the proposed Merger was put to the stockholders for a vote.[135] The Board did not object but, instead, continued to negotiate on that basis.[136] And, again, the fact the Voting Agreement itself was not signed until after the Board approved the Merger further suggests this was not an interested stockholder acting to take over the Company without the Board's consent, which, as explained below, is the precise problem Section 203 was designed to solve.[137]

Ultimately, Plaintiff's attempt to pigeonhole Defendants' conduct into a violation of Section 203 is inconsistent with the statute's designated purpose. Section 203 was intended "to strike a balance between the benefits of an unfettered market for corporate shares and the well-documented and judicially recognized need to limit abusive takeover tactics."[138] Plaintiff's view of Section 203 would authorize

---

[135] Compl. ¶ 133; Proxy at 55.

[136] Compl. ¶ 133; Proxy at 52.

[137] *See Chesapeake*, 771 A.2d at 353.

[138] H.B. 396, 134th General Assembly 9 (1987); *Chesapeake*, 771 A.2d at 353 (same); *see also Timothy Leisz v. MSG Networks, Inc., et al.*, C.A. 2021-0504-KSJM (Del. Ch. July 6, 2021) (TRANSCRIPT) at 21 (discussing Section 203's legislative history at length, finding the statute's purpose is "to limit abusive takeover tactics," and that its effect, when properly applied, was to "forc[e] any hostile acquirer to negotiate a transaction with the board"); *Apostle Mamakas v. Iconix Brand Gp., Inc.*, C.A. 2021-0632-KSJM (Del. Ch. July 26, 2021) (TRANSCRIPT) at 12 (holding that a Section 203 claim was not colorable

the court to prevent a merger even when a target's board was aware of, and did not object to, a buyer's attempt to secure the endorsement of a significant stockholder in favor of a deal that the board itself was attempting to secure for all of the target's stockholders. Even if Plaintiff is correct that the Board had not formally approved of either the Merger or Voting Agreement prior to July 26, and that there was a meeting of the minds between the Baker Brothers Entities and Exact with respect to voting on July 26, it is undeniable that the Merger was formally approved by the Board on July 28 (with full knowledge of the Voting Agreement negotiations) and endorsed by the Board much earlier than that.[139] Nothing about this dynamic suggests Exact was engaged in "abusive takeover tactics."[140] Because "this court should be hesitant to strain the statute's language to cover situations that do not threaten the interests the statute was designed to protect," Plaintiff's Section 203 must be dismissed.[141]

---

because, consistent with the statutory purpose of "discourag[ing] hostile takeovers," the board was significantly involved in negotiating the transaction in question).

[139] Compl. ¶¶ 106, 133; Proxy at 55.

[140] *Chesapeake*, 771 A.2d at 353 ("[T]hey failed to submit convincing evidence that such deals increase the potential for 'abusive takeovers.'").

[141] *Id.* Given that Plaintiff's conversion claim rests on the premise that Defendants violated Section 203, Count II must likewise be dismissed.

## C. The Breach of Fiduciary Duty Claims

Apparently appreciating that "the gating question that frequently dictates the pleadings stage disposition of a breach of fiduciary duty claim [is] under what standard of review will the court adjudicate the claim,"[142] Plaintiff has pulled out all stops to implicate either entire fairness review or *Revlon* enhanced scrutiny in order to survive dismissal. Defendants work equally hard to cast Plaintiff's fiduciary duty claims as poster illustrations of a stockholder's after-the-fact quibbles with the exercise of business judgment by corporate fiduciaries that should not be subjected to judicial second-guessing. On this day, Defendants have the far better of the argument.

"Section 141 of the Delaware General Corporation Law empowers the board of directors of a Delaware corporation to manage the corporation's business and affairs."[143] When exercising this authority, directors owe unremitting fiduciary duties of loyalty and care to the company's stockholders.[144] The default standard of review guiding this court's determination of whether directors violated those fiduciary duties, the business judgment rule, affords corporate fiduciaries a

---

[142] *Tornetta v. Musk*, 2019 WL 4566943, at *1 (Del. Ch. Sept. 20, 2019).

[143] *Larkin v. Shah*, 2016 WL 4485447, at *8 (Del. Ch. Aug. 25, 2016) (citing 8 *Del. C.* § 141(a)).

[144] *Cede & Co. v. Technicolor*, 634 A.2d 345, 360 (Del. 1993).

presumption that they have "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[145] When this deferential standard applies, Delaware courts will not second-guess a board's decision unless it "cannot be attributed to any rational business purpose."[146]

Several avenues exist to rebut the business judgment presumption and hold the conduct of directors to a higher standard of review.[147] Delaware courts will apply the highest standard of review, entire fairness, where: "(1) properly reviewable facts reveal that the propriety of a board decision is in doubt because the majority of the directors who approved it were grossly negligent, acting in bad faith, or tainted by conflicts of interest; or (2) the plaintiff presents facts supporting a reasonable inference that a transaction involved a controlling stockholder."[148] Importantly, the presence of a controller will not *per se* trigger entire fairness review; this heightened standard is only appropriate when a controller "engage[s] in a conflicted

---

[145] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) (citation omitted).

[146] *Cede*, 634 A.2d at 361 (internal quotations omitted) (quoting *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)).

[147] *See In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 663 (Del. Ch. 2013) (discussing the application of entire fairness, *Revlon* and the business judgment rule).

[148] *Larkin*, 2016 WL 4485447, at *8 (citations omitted).

transaction."[149] And, under our law, a controller engages in a conflicted transaction when: "(a) the controller stands on both sides; [or] (b) [] the controller competes with the common stockholders for consideration."[150]

Delaware courts will move past the business judgment rule and review director conduct with enhanced scrutiny under *Revlon* when directors are confronted with a change of control transaction that presents the board with the opportunity to secure "the best value reasonably available to the stockholders."[151] *Revlon* duties can be triggered in three ways:

> (1) when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company; (2) where, in response to a bidder's offer, a target abandons its long-term strategy and seeks an alternative transaction involving the break-up of the company; or (3) when approval of a transaction results in a sale or change of control.[152]

---

[149] *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at \*14 (Del. Ch. Oct. 24, 2014); *see also In re Viacom Inc. S'holders Litig.*, 2020 WL 7711128, at \*11 (Del. Ch. Dec. 29, 2020), as corrected (Dec. 30, 2020) ("That fiduciary duty, reflecting the standard of conduct expected of the controller, is to be distinguished from the standard of review by which the court tests whether the fiduciary has met the standard of conduct." (citation omitted)).

[150] *Crimson*, 2014 WL 5449419, at \*12*; see also Larkin*, 2016 WL 4485447, at \*8 ("Conflicted transactions include those in which the controller stands on both sides of the deal (for example, when a parent acquires its subsidiary), as well as those in which the controller stands on only one side of the deal but 'competes with the common stockholders for consideration.'" (citation omitted)).

[151] *Paramount Commc'ns, Inc. v. QVC Network, Inc.*, 637 A.2d 34, 43 (Del. 1994) (noting that *Revlon* requires directors to take reasonable steps to get the best deal).

[152] *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1290 (Del. 1994) (cleaned up).

Of course, regardless of the standard of review, as a matter of statute, a plaintiff "still must plead a non-exculpated claim of breach of fiduciary duty" to survive dismissal when a company's charter contains "an exculpatory provision authorized by 8 *Del. C.* § 102(b)(7) that immunizes the directors for liability for money damages as a result of the breach of the duty of care."[153] Accordingly, to overcome Genomic's exculpatory charter provision, as to each named director defendant, Plaintiff must "plead[] facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith."[154]

Plaintiff's pitch for entire fairness review is that the Baker Brothers Entities controlled Genomic because "it is reasonably conceivable that [their] minority stake was so potent that independent directors [could not] freely exercise their judgment, fearing retribution."[155] And, according to Plaintiff, the Baker Brothers Entities' unique desire to exit their investment in Genomic separated their interests from those

---

[153] *Morton's*, 74 A.3d at 663 (citation omitted); *see Paramount*, 637 A.2d at 46–48.

[154] *In re Cornerstone Therapeutics Inc, S'holder Litig.*, 115 A.3d 1173, 1179–80 (Del. 2015) (citation omitted); *id.* at 1182 (emphasizing that "each director has a right to be considered individually when the directors face claims for damages in a suit challenging board action" (citations omitted)).

[155] *In re Essendant, Inc. S'holder Litig.*, 2019 WL 7290944, at *8 (Del. Ch. Dec. 30, 2019) (internal quotations omitted) (citations omitted).

of other stockholders in a way that created a legally cognizable conflict.[156] Plaintiff must prevail on both arguments to justify review of her breach of fiduciary duty claims under entire fairness.[157] As explained below, she fails on both fronts.

Plaintiff's attempt, in the alternative, to justify enhanced scrutiny under *Revlon* rests on the argument that the Board was engaged in an "active bidding process" that led to a "change of control" transaction. As explained below, the pled facts say otherwise. But, even if *Revlon* applies, the Individual Defendants, in their capacities as directors, are protected from liability by Genomic's exculpatory charter provision. As explained below, Plaintiff has fallen well short of pleading "a non-exculpated breach of [] *Revlon* duties."[158]

As a last-ditch effort, Plaintiff attempts to argue that the business judgment rule is rebutted because members of the Board engaged in bad faith violations of their duty of disclosure. Even if Plaintiff is correct that the Board failed to include

---

[156] *Crimson*, 2014 WL 5449419, at *12 (noting that entire fairness review is justified "where the controller competes with the common stockholders for consideration").

[157] *Larkin*, 2016 WL 4485447, at *15 (holding that either a lack of control status or a lack of a conflict each independently deny plaintiff access to entire fairness review).

[158] *Kahn v. Stern*, 183 A.3d 715, 2018 WL 1341719, at *1 n.3 (Del. 2018) (citations omitted); *see also Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001) (affirming dismissal of *Revlon* claim where plaintiff failed to well plead that board members were conflicted or acted in bad faith while "maximizing the sale price of the enterprise").

38

certain material information in its Proxy ahead of the stockholder vote, the Complaint does not even purport to allege such action was taken in bad faith.[159]

This leaves the business judgment rule as the only sustainable standard of review. With nothing left to rebut the presumption, the fiduciary duty claims against both the controller and each Individual Defendant, in their capacities as directors, must be dismissed.[160]

### 1. Entire Fairness Review Not Justified

Plaintiff contends the Merger was the product of the undue influence of a conflicted controlling stockholder because (1) the Baker Brothers Entities exerted actual control over the transaction through their domination of a majority of the Board and (2) the Baker Brothers Entities, as controller, competed with the minority through the extraction of a non-ratable benefit, namely increased liquidity. Neither argument holds weight under our law.

### a. The Baker Brothers Entities as Controlling Stockholders

"In the seminal *Kahn v. Lynch Communications Systems, Inc.*, the Supreme Court observed that Delaware courts will deem a stockholder a controlling stockholder when the stockholder: (1) owns more than 50% of the voting power of

---

[159] *Arnold*, 650 A.2d at 1287 (holding that Section 102(b)(7) exculpation applies to alleged duty of disclosure violations).

[160] I take up the claims against Popovits as CEO separately.

a corporation or (2) owns less than 50% of the voting power of the corporation but '*exercises control* over the business affairs of the corporation.'"[161]  Because it is undisputed that the Baker Brothers Entities owned approximately 25% of Genomic's outstanding stock at the time of the Merger, Plaintiff must well plead that they actually "controlled the business affairs" of Genomic notwithstanding their minority stake.  In other words, Plaintiff must well plead that the Baker Brothers Entities exercised "such formidable voting and managerial power that [they], as a practical matter, [are] no differently situated than if [they] had majority voting control."[162]

Plaintiff maintains her Complaint allows a reasonable inference that the Baker Brothers Entities **either** "actually dominated and controlled the corporation, its board or the deciding committee with respect to the challenged transaction,"[163] such that their "presence [was] hard to ignore because [they had] injected [themselves] as 'dominator' into the board's process while it considers the transaction and [were], in that sense, actually 'in the board room,'"[164] **or** they "actually dominated and

[161] *In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *12 (Del. Ch. Mar. 28, 2018) (emphasis in original) (quoting *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113–14 (Del. 1994)).

[162] *Morton's*, 74 A.3d at 665 (citation omitted).

[163] *In re Rouse Props., Inc.*, 2018 WL 1226015, at *12 (Del. Ch. Mar. 9, 2018) (citing *Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006)).

[164] *Id.*

controlled the majority of the board generally."[165] In the latter scenario, the Baker Brothers Entities' "dominating presence [allegedly] is evidenced by the [B]oard's awareness of [their] ability to make changes at the [B]oard level or to push other coercive levers should [they] be displeased with the [B]oard's performance or decision-making."[166]

Contrary to Plaintiff's characterization of her pleading, the Complaint lacks *any* well-pled allegations of general control, as the Baker Brothers Entities own a mere 25% voting interest, hold only two of the eight Board seats and do not meddle in the day-to-day operations of the Company.[167] Simply stated, there is nothing in the Complaint that would allow a reasonable inference of general control.

Plaintiff's attempt to cast the Baker Brothers Entities as controlling stockholder with respect to the Merger fares no better.[168] Delaware law presumes "that a director's decision is based on the corporate merits of the subject matter before the board rather than extraneous considerations or influence."[169] "In order to

---

[165] *Id.*

[166] *GGP*, 2021 WL 2102326, at *13 (internal quotations omitted) (citation omitted).

[167] Compl. ¶¶ 14–15, 182, 185. *Contra In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 552 (Del. Ch. 2003) (noting the alleged controller's "day-to-day managerial supremacy" as a factor in finding general control).

[168] AB 46–55.

[169] *In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *11 (Del. Ch. May 22, 2000) (citation omitted).

overcome that presumption in the controller context, the plaintiff must plead facts that support a reasonable inference the director is either beholden to the shareholder or so under its influence that his discretion is sterilized."[170] Nothing in the Complaint supports that inference with respect to the relationship between the Baker Brothers Entities and the Board.

First, there is no well-pled allegation that the Baker Brothers Entities ultimately "dominated or controlled [Genomic's] corporate decision-making process."[171] The best Plaintiff can do here is to allege that the Baker Brothers Entities were 45% Genomic stockholders and controlled the M&A committee formed to evaluate the possibility of a merger *in 2017*.[172] The well-pled allegations in the Complaint, however, make clear that back in October 2017, while Genomic

---

[170] *Rouse*, 2018 WL 1226015, at *13 (cleaned up).

[171] *Id.* at *15 (internal quotations omitted) (citation omitted); *see also Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426, at *4 (Del. Ch. Aug. 25, 2006) ("[T]he focus of the inquiry has been on the *de facto* power of a significant (but less than majority) shareholder, which, when coupled with other factors, gives that shareholder the ability to dominate the corporate decision-making process."); *Larkin*, 2016 WL 4485447, at *15 (rejecting plaintiff's unsupported contention that a defendant was a controlling stockholder and noting the complaint did not allege "either overt or even subtle bullying"); *In re Loral Space & Commc'ns Inc.*, 2008 WL 4293781, at *21 (Del. Ch. Sept. 19, 2008) (finding, as an essential component of its ruling that the plaintiff had well pled the existence of a controlling stockholder, that the controller "controlled Loral's decision to pursue the growth strategy that necessitated additional capital financing and the time table for obtaining that capital").

[172] Compl. ¶¶ 14–24, 43, 48, 51.

was considering a sale, no final indications of interest were received.[173]  Then, "Exact [] show[ed] up unsolicited and unannounced" two years later, in June 2019, to discuss a potential merger.[174]  The Complaint is conspicuously silent as to any indicia of control the Baker Brothers Entities wielded over the negotiations with Exact.  Indeed, the picture the Complaint attempts to paint (albeit with broad strokes and abstract technique) is of Popovits, not the Baker Brothers Entities, acting as the force that drove the Board to recommend the Merger to Genomic stockholders.[175]

Without any indication that the Baker Brothers Entities steered the negotiations or otherwise dominated or had the ability to "dominate the corporate decision-making process,"[176] the Complaint's allegations that Felix and Julian Baker were friends and business partners with a majority of the Board fall flat.  Even if it were true that a majority of the Board was not independent of the Baker Brothers Entities, a dubious proposition given the thin pleading here (see below), this still would not be enough to trigger entire fairness.  To hold otherwise would be to

---

[173] Compl. ¶ 58.

[174] Compl. ¶¶ 63–64.  Again, Plaintiff does not allege that Exact had any relationship with the Baker Brothers Entities prior to the Merger.

[175] *See, e.g.*, ¶ 64 ("[O]n June 11, 2019, Conroy contacted Popovits out of the blue to request a management meeting for the purpose of exploring a potential combination."); *see also* Compl. ¶¶ 65–75 (alleging Popovits played a substantial role in the Merger negotiations).

[176] *GGP*, 2021 WL 2102326, at *15.

"conflat[e] a pleading that a majority of the Board lacked independence from an interested party, with a pleading of actual control by that interested party."[177] "Consideration of controller status focuses on the alleged controller, and whether it effectively controls the board of directors so that it also controls disposition of the interests of the unaffiliated stockholders."[178] Again, nothing in the Complaint allows an inference that the Baker Brothers Entities even attempted to control, much less succeeded in exercising "actual control" over, this transaction.[179]

Even assuming the relationships between the Baker Brothers Entities and Board members were relevant here, none of the relationships are of a nature that they would rebut any director's presumed independence. Of the six directors not directly affiliated with the Baker Brothers Entities, Plaintiff challenges the independence of five: Fuchs, Popovits, Flannelly, Parker and Cohen.[180] As to each, it is useful to reiterate our Supreme Court's admonition that "[b]are allegations that directors are friendly with, travel in the same social circles as, or have past business relationships

---

[177] *Sciabacucchi v. Liberty Broadband Corp.*, 2017 WL 2352152, at \*17 (Del. Ch. May 31, 2017).

[178] *Id.*

[179] *But see Rouse*, 2018 WL 1226015, at \*12 ("[T]he controller's presence is hard to ignore because he has injected himself as 'dominator' into the board's process while it considers the transaction and is, in that sense, actually 'in the board room.'").

[180] AB 48–56.

with the proponent of a transaction . . . are not enough to rebut the presumption of independence."[181]

**Fuchs.** The Complaint alleges that Fuchs' principal job is at BioMarin, a company in which the Baker Brothers Entities have significant investments.[182] The Complaint fails to mention, however, whether those significant investments gave the Baker Brothers Entities "unilateral power," much less substantial sway, over Fuchs' compensation or future job prospects at BioMarin.[183] The Complaint next alleges that the Baker Brothers Entities' nomination of Fuchs to the AnorMED, Inc. board of directors, their suggestion of Fuchs as a compromise pick to the Board and their role in appointing Fuchs as executive and director at Onyx Pharmaceuticals and

---

[181] *Kahn v. M&F Worldwide Corp.*, 88 A.3d 635, 649 (Del. 2014), *overruled on other grounds by Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018); *see also Huff Energy Fund, L.P. v. Gershen*, 2016 WL 5462958, at *12 (Del. Ch. Sept. 29, 2016) ("Our law is clear that personal friendships, without more, and outside business relationships are each insufficient to raise a reasonable doubt of a director's ability to exercise independent busines judgment.").

[182] Compl. ¶ 21.

[183] *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 177 (Del. Ch. 2005), *aff'd*, 906 A.2d 114 (Del. 2006) ("This Court will not find a director beholden unless the purported controlling person has 'unilateral' power to substantially affect the director."). Plaintiff points to *Del. Cty. Empls. Ret. Fund v. Sanchez*, as support for her argument that "unilateral" power to affect a director is not the appropriate metric by which to evaluate whether a director is beholden to a controller. 124 A.3d 1017, 1023 n.25 (Del. 2015). Even if this is accurate, the Court in *Sanchez* found it reasonably conceivable that a director was not independent of the controller where the complaint well pled that the controller was "very influential at [the director's principal employer] as a whole." *Id.* The well-pled facts here simply do not allow that inference with respect to Fuchs.

45

Andrea Biosciences shortly after the Baker Brothers Entities invested in these companies supports a reasonable inference that he is beholden to the Baker Brothers Entities.[184] I disagree. "It is well-settled Delaware law that a director's independence is not compromised simply by virtue of being nominated to a board by an interested stockholder."[185] But that is all Plaintiff has alleged here. That the Baker Brothers Entities may have participated in Fuchs' placement on the boards of various entities, including Genomic, without more, does not support a reasonable inference that Fuchs was beholden to the Baker Brothers Entities.

**Popovits.** The Complaint alleges Popovits has been a director and officer at Genomic for twenty years and received substantial compensation throughout, all during a time in which the Baker Brothers Entities have held a significant stake in the Company.[186] This allegation, of course, says nothing of the Baker Brothers Entities' control over the Board or any of its members, including Popovits. Plaintiff

---

[184] Compl. ¶¶ 22–23.

[185] *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 996 (Del. Ch. 2014), *aff'd sub nom. Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015) (citations omitted); *see also Aronson*, 473 A.2d at 815 (finding that directors who were "personally selected" by a 47% stockholder did not lack independence); *id.* at 816 (noting that placement on the board by "those controlling the outcome of a corporate election" is "the usual way a person becomes a corporate director"); *Frank v. Elgamal*, 2014 WL 957550, at *22 (Del. Ch. Mar. 10, 2014) ("Merely because a director is nominated and elected by a large or controlling stockholder does not mean that he is necessarily beholden to his initial sponsor.") (citation omitted).

[186] Compl. ¶¶ 14, 16, 178.

then alleges that Popovits became a board member of Kiniksa, Myokardia, Inc. and Nuvelo, Inc. soon after the Baker Brothers Entities began investing in these companies, apparently as support for an inference that she was appointed to these boards by the Baker Brothers Entities.[187]  The proffered inference stretches beyond its tolerance, however, as there are no allegations that reveal the level of the Baker Brothers Entities control at these companies.  More to the point, even if the inference were reasonable, the fact the Baker Brothers Entities appointed Popovits to these various boards does not, alone, cloud her independence as a Genomic fiduciary.[188]

**Flannelly**.  The Complaint alleges the Baker Brothers Entities are the largest stockholder of Flannelly's principal employer, Incyte, and that Julian Baker has been the lead independent director there since 2015.[189]  Again, the Complaint's allegations do not support a reasonable inference that the Baker Brothers Entities had sufficient power to influence Flannelly's decision-making.  The same can be said for Flannelly's prior appointments to the boards of Onyx and Protara

---

[187] Compl. ¶ 16.

[188] *KKR*, 101 A.3d at 996.

[189] Compl. ¶ 17.

Therapeutics, Inc. during a time the Baker Brothers Entities were significant investors.[190]

**Parker**. The Complaint alleges the Baker Brothers Entities are significant stockholders of Tricida, where Parker is an executive, and significant investors in other companies where Parker was a director.[191] These allegations fail to rebut Parker's independence for the same reasons as the rest; there is no indication the Baker Brothers Entities had substantial say in his compensation or job prospects at Tricida and the mere fact he served with or was appointed by the Baker Brothers Entities as a director at companies in which they invest does not, alone, move the needle.[192]

---

[190] *See, e.g.*, *Highland Legacy Ltd. v. Singer*, 2006 WL 741939, at *5 (Del. Ch. Mar. 17, 2006) (finding that "serv[ing] together on a few boards of unaffiliated companies" is not enough to support a lack of independence).

[191] Compl. ¶ 19.

[192] Plaintiff's reliance on *In re Primedia Inc. Deriv. Litig.* for the proposition that a director's prior ties to entities associated with the controller *de jure* compromise the director's independence is misplaced. 910 A.2d 248, 258 (Del. Ch. 2006). There, the court noted that "[w]hile KKR's nomination of its associates to Primedia's board, without more, does not establish actual domination, this *is not a case* where the plaintiffs allege control solely on the grounds that KKR made such appointments." *Id.* (emphasis added) (citations omitted). But this *is precisely* that "case"; Plaintiff's sole allegation to impugn the independence of each director is that each director was, at some point, appointed to the board of a company that the Baker Brothers Entities were invested in and/or was appointed with the Baker Brothers Entities' assistance. Neither is sufficient to overcome the presumption of independence.

**Cohen**.   Finally, the Complaint alleges Cohen is beholden to the Baker Brothers Entities because his firm, Vida Ventures, has a long history of investing alongside the Baker Brothers Entities.[193]  It is not surprising that Plaintiff provides no authority for the proposition that this incidental relationship has a reasonably conceivable bearing on the director's ability to act independently of his fellow investor/traveler.[194]

### b.  The Baker Brothers Entities as Conflicted Controllers

Plaintiff's failure adequately to plead the presence of a controlling stockholder is an independent reason to dispense with her attempt to invoke entire fairness review.   Even if the Baker Brothers Entities were, together,[195] controlling stockholders, however, Plaintiff still fails to invoke entire fairness review because she has not well pled a basis to infer that the controller acted under a conflict of interest with respect to the Merger.

---

[193] Compl. ¶ 20.

[194] *Cf. Zimmerman ex rel. Priceline.com, Inc. v. Braddock*, 2002 WL 31926608, at *11 (Del. Ch. Dec. 20, 2002) ("[A] director's investment in another company allegedly controlled by the same individual who is said to be a dominating force in the company under analysis does not suggest, without more, that the investing director lacks independence.").

[195] Because there is no need, I decline to go down the rabbit hole to determine whether Plaintiff has well pled that the Baker Brothers Entities operated as a "control group" under our law.

As discussed, "[e]ntire fairness is not triggered solely because a company has a controlling stockholder. The controller also must engage in a conflicted transaction."[196] A controlling shareholder is conflicted when it stands on both sides of the transaction or competes with the minority for consideration.[197] Plaintiff does not allege the Baker Brothers Entities had any pre-Merger relationship with Exact, and thus, does not allege that the Baker Brothers Entities stood on both sides of the Merger. Thus, Plaintiff must plead a conflict on the basis that the Baker Brothers Entities somehow competed with Genomic's other stockholders for consideration in the Merger. This presents a tall order for any plaintiff.

This court has identified three examples where a controller might compete with the minority in a manner that creates a legally cognizable conflict: "(1) where the controller receives greater monetary consideration for its shares than the minority stockholders; (2) where the controller takes a different form of consideration than the minority stockholders; and (3) where the controller gets a 'unique benefit' by extracting something uniquely valuable to the controller, even if the controller nominally receives the same consideration as all other stockholders."[198] Plaintiff

---

[196] *Crimson*, 2014 WL 5449419, at *12.

[197] *Id.*

[198] *IRA Tr. FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *6 (Del. Ch. Dec. 11, 2017) (internal quotations omitted) (citations omitted).

50

does not allege that the Baker Brothers Entities received greater or even different consideration than Genomic's minority stockholders; her only argument is that they managed to extract a "unique benefit" by virtue of the Merger. Specifically, she argues the Baker Brothers Entities' supposed desire to exit their investment in Genomic supports an inference that they directed the Board to recommend the Merger at an unfair price.[199]

The conclusory allegation that the Baker Brothers Entities sought liquidity does not, by itself, support a reasonable inference that they extracted a "unique benefit" from the Merger.[200] "Delaware courts have been reluctant to find that a liquidity-based conflict rises to the level of a disabling conflict of interest when a large blockholder receives pro rata consideration."[201] At bottom, controlling stockholders have "interests identical to other stockholders: to maximize the value

---

[199] Compl. ¶ 160(d) ("The Baker Brother Entities breached their fiduciary duties as controlling stockholders by insisting on a transaction that was not value maximizing, but instead by insisting on a transaction at an inopportune time, solely to satisfy their own desired liquidity."); AB at 57.

[200] *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1035 (Del. Ch. 2012) ("Generally speaking, a fiduciary's financial interest in a transaction as a stockholder (such as receiving liquidity value for her shares) does not establish a disabling conflict of interest when the transaction treats all stockholders equally . . . ." (citations omitted)).

[201] *Firefighters' Pension Sys. of City of Kan. City, Mo. Tr. v. Presidio, Inc.*, 251 A.3d 212, 256 (Del. Ch. 2021) (cleaned up).

of [their] shares."[202]   With this in mind, the court in *In re Synthes* held that a "liquidity-based" allegation that a controlling stockholder was conflicted would support a reasonable inference of conflict only in instances when the plaintiff could well plead that the transaction was the product of a "fire sale where the controller, in order to satisfy an exigent need (such as a margin call or default in a larger investment) agreed to a sale of the corporation without any effort to make logical buyers aware of the chance to sell, give them a chance to do due diligence, and to raise the financing necessary to make a bid that would reflect the genuine fair market value of the corporation."[203]   The court reasoned that a mere desire to sell cannot create a conflict given that controlling stockholders "usually have the largest financial stake in the transaction and thus have a natural incentive to obtain the best price for their shares."[204]

More recent decisions have refined this court's orientation with respect to alleged liquidity-based conflicts.  In *In re Mindbody, Inc.*, for example, this court found that facts implying a "crisis," "fire sale" or "exigent need" for "immediate

---

[202] *Morton's*, 74 A.3d at 666–67; *see also Goodwin v. Live Entm't, Inc.*, 1999 WL 64265, at *27 (Del. Ch. Jan. 25, 1999), *aff'd*, 741 A.2d 16 (Del. 1999) (noting a controller's "natural desire to obtain the best price for its shares"); *Synthes*, 50 A.3d at 1035 (explaining a controller's "natural incentive to obtain the best price for [its] shares").

[203] *Synthes*, 50 A.3d at 1036.

[204] *Id.* at 1035 (citations omitted).

cash" are not necessary to well plead a liquidity-based conflict.[205] While the court recognized "it is a rare set of facts that will support a liquidity-driven conflict theory," the court held that the plaintiff well pled the "rare fact pattern" where a controller was unable to access his own wealth, was strapped for cash in light of significant personal expenses and made sure his financial advisors knew that the sale of his stake was "top of mind."[206]

In *Firefighters' Pension System of City of Kansas City, Missouri Trust v. Presidio, Inc.*, the court determined that while pleading a "fire sale" is not necessary, plaintiff must plead "facts that support a reasonable inference of a divergent interest" with respect to liquidity.[207] There, the court found that the cyclicality of private equity funds, by itself, did not give rise to a liquidity-based conflict.[208]

Plaintiff has failed to allege anything remotely resembling a fire sale, substantial liquidity crisis or otherwise divergent interest that would create a

---

[205] 2020 WL 5870084, at *17 (Del. Ch. Oct. 2, 2020); *see also Presidio*, 251 A.3d at 256 ("In *Mindbody*, Vice Chancellor McCormick discussed *Synthes* at length, explaining persuasively why the extreme language in *Synthes* should not be read as establishing a general rule.").

[206] *Mindbody*, 2020 WL 5870084, at *18; *see also New Jersey Carpenters Pension Fund v. Infogroup, Inc.*, 2011 WL 4825888, at *9 (Del. Ch. Sept. 30, 2011) (holding the complaint well-pled a liquidity-based conflict where the blockholder owed $25 million, had no source of income, recently had paid out $4.4 million and wanted to start a new business venture).

[207] 251 A.3d at 257.

[208] *Id.* at 258.

reasonable inference that the Baker Brothers Entities were conflicted with respect to the Merger. Her flawed conflict theory begins with the unsubstantiated contention that the Baker Brothers Entities somehow instigated the discussions leading to the Merger.[209] What the Complaint actually says, however, is that the Board, not the Baker Brothers Entities, began the consideration of strategic alternatives in 2017.[210] Two years later, in 2019, Exact lobbed an unsolicited inbound proposal to Genomic without any involvement, much less prompting, from the Baker Brothers Entities.[211] And nothing in the Complaint supports a reasonable inference that, at the time of the Exact proposal, the Baker Brothers Entities faced liquidity concerns, needed out of their Genomic investment or desired (much less sought) to force a quick sale. The best Plaintiff can muster is an allegation that the Baker Brothers Entities wanted (not needed) to sell their stake in Genomic,[212] but that cannot support an inference they were willing to accept less than the fair value of their shares and certainly cannot support an inference they were incentivized to cause the Board to deprive other stockholders of the fair value of their shares.

---

[209] AB at 58.

[210] Compl. ¶ 48.

[211] Compl. ¶¶ 63–64.

[212] *See, e.g.*, Compl. ¶ 45 (explaining the Baker Brothers Entities' 2016 failed attempt at using the Registration Rights Agreement to exit their Genomic investment).

Plaintiff then points to the Baker Brothers Entities' history of stock sales as evidence of conflict.[213]  While I confess the argument is difficult to follow, to the extent Plaintiff suggests that past stock sales reveal some liquidity crisis or other driver that would prompt self-sacrificing urgency, I cannot reasonably draw that inference.  The Baker Brothers Entities' actions are consistent with any investor's desire to reap maximum returns; they are in no way indicative of a liquidity crisis or a desire to extract consideration from the market at the expense of other stockholders.[214]  Controlling stockholders "have the right to deal freely with their shares of stock and to dispose of them at the best price they are able to obtain, so long as they are acting in good faith."[215]  Ultimately, Delaware law does not demand

---

[213] AB at 58–59 (discussing the Baker Brothers Entities' decision to sell off large blocks of Genomic stock in late 2018 when Genomic's stock price went above $90 per share, to stop selling in April 2019 when the stock price fell below $50, and then to support the Merger in the wake of this activity as evidence of conflict).

[214] In fact, this theory reveals that the stock was relatively easy to trade, a further indication that even if the Baker Brothers Entities wanted out of their investment, a quick sale of the entire company was not necessary.  *Contra In re Answers Corp. S'holder Litig.*, 2012 WL 1253072, at *3 (Del. Ch. Apr. 11, 2012) (finding well-pled allegations of a 30% blockholder's liquidity-based conflict where, *inter alia*, it "would only be able to monetize its entire interest if the whole Company were sold" given that the stock was thinly traded).

[215] *Frantz Mfg. Co. v. EAC Indus.*, 501 A.2d 401, 408 (Del. 1985) (citations omitted); *see also Morton's*, 74 A.3d at 670–71 ("Like other stockholders, private equity firms are entitled to sell at a good price for the benefit of their investors." (citations omitted)); *Synthes*, 50 A.3d at 1039 ("It is, of course, true that controlling stockholders are putatively free under our law to sell their own bloc for a premium or even to take a different premium in a merger." (citations omitted)).

that a controlling stockholder "engage in self-sacrifice for the benefit of minority shareholders."[216]

Plaintiff also appear to ask the Court to draw the "unusual" and "counterintuitive" inference that the Baker Brothers Entities made their buy and sell decisions with an eye towards depressing Genomic's stock.[217] Once again, Plaintiff seeks more than her Complaint will bear. The fact that a controlling stockholder does not accede to another deal or allow the minority to get a better price (that may or may not be out there) than the controller will receive does not make a controller conflicted.[218]

After a careful review of the Complaint, I am satisfied Plaintiff has not pled a basis upon which the Court could infer that the Baker Brothers Entities extracted a non-ratable benefit from the Merger that caused their interests to depart from the interests of other Genomic stockholders. The vague allegation that the Baker Brothers Entities sought liquidity, without more, does not suffice. Accordingly,

---

[216] *Synthes*, 50 A.3d at 1040 (citations omitted).

[217] Compl. ¶ 48 ("Given the Baker Brothers Entities' multi-year effort to liquidate their investment, it is reasonable to infer that they pushed the Board into a sale process."); AB at 58–59; *see Larkin*, 2016 WL 4485447, at *16 ("This court has, in the past, evaluated liquidity theories of this sort with marked skepticism, characterizing them as 'unusual,' 'counterintuitive,' and 'aggressive.'" (citation omitted)).

[218] *Synthes*, 50 A.3d at 1041 ("[M]inority stockholders are not entitled to get a deal on better terms tha[n] what is being offered to the controller, and the fact that the controller would not accede to that deal does not create a disabling conflict of interest.").

56

because the Baker Brothers Entities are not conflicted controllers, and Plaintiff has failed to plead any other fiduciary conflicts, there is no basis to review the Merger for entire fairness.

## 2. Enhanced Scrutiny Not Justified

Plaintiff maintains that enhanced scrutiny under *Revlon* is justified because the Merger was, or should have been, the product of an active bidding process that led to a change-of control transaction. She then argues, under *Revlon*, that the Board failed to maximize the value of Genomic and did so in *bad faith*. The arguments fail on both accounts.

### a. *Revlon* Not Implicated

Enhanced scrutiny under *Revlon* is the appropriate standard of review: "(1) when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company[ ]; (2) where, in response to a bidder's offer, a target abandons its long-term strategy and seeks an alternative transaction involving the break-up of the company; or (3) when approval of a transaction results in a sale or change of control [.]"[219]

---

[219] *In re Smurfit-Stone Container Corp. S'holder Litig.*, 2011 WL 2028076, at *12 (Del. Ch. May 20, 2011), as revised (May 24, 2011) (citing *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 71 (Del. 1995)) (alterations in original).

Contrary to Plaintiff's assertions, none of these triggers confronted the Board with respect to the Merger.[220]

According to Plaintiff, an "active bidding process" began in October 2017, when the Company was "put in play" following the Board's exploration of strategic alternatives.[221] As part of this process, Exact, among others, entered into a confidentiality agreement with Genomic as it considered whether to make a proposal.[222] By Plaintiff's lights, this evidences an active bidding process that worked its way through 2019 until the Merger with Exact closed.[223] But Plaintiff's litigation-driven characterization is belied by its own allegations. While Exact may have sought to get a glimpse behind the curtain in 2017, the Complaint does not allege that Exact communicated any expression of interest at that time, much less

---

[220] To be clear, even if Genomic was engaged in an active bidding process (it was not), *Revlon* would not be implicated unless and until the active bidding process resulted in a change of control transaction. *See In re Paxson Commc'n Corp. S'holders Litig.*, 2001 WL 812028, at *7 (Del. Ch. July 12, 2001) ("*Revlon* does not apply where the plaintiffs cannot allege that a sale or change of control has taken place or necessarily will take place such that the public shareholders of a corporation have been or will be deprived of a control premium."); *Santa Fe*, 669 A.2d at 70–71 ("Plaintiffs appear to rest their claim of a duty to seek the best value reasonably available on allegations that the Board initiated an active bidding process. Plaintiffs do not consider, however, that this method of invoking the duty requires that the Board also seek to sell control of the company or take other actions which would result in a break-up of the company.").

[221] Compl. ¶¶ 48, 56–57, 108 (alleging that 27 parties were contacted following which the Board received numerous indications of interest).

[222] Compl. ¶ 56.

[223] AB 60–61.

58

that it made an offer to acquire Genomic.[224]  Instead, the only reasonable inference from the Complaint is that Exact faded away in the mist along with all the other potential suitors in 2017.  All remained quiet on the transaction front from October 2017 through June 2019, when, according to the Complaint, Exact's Conroy "contacted Popovits *out of the blue* to request a management meeting for the purpose of exploring a potential combination."[225]  After significant back-and-forth over the next month and a half, the parties came to an understanding and executed the Merger Agreement.[226]  This cannot conceivably be characterized as an "active bidding process."

Even more importantly, however, there are no well-pled allegations that the Merger resulted in a change of control.  In an all-cash transaction, *Revlon* applies "because there is no tomorrow for the corporation's present stockholders."[227] At issue here is a transaction with both cash and stock offered as consideration. At best for Plaintiff, the Merger was comprised of 58% stock and 42% cash.[228]  The question, then, is whether that mix of consideration triggers enhanced scrutiny.

---

[224] Compl. ¶¶ 57–58.

[225] Compl. ¶ 64 (emphasis added).

[226] Compl. ¶ 106.

[227] *Smurfit-Stone*, 2011 WL 2028076, at *13.

[228] AB at 17.  There is a dispute as to whether the stock component comprised either 58% or 62% of the total transaction consideration.  Giving Plaintiff all reasonable inferences,

In the context of a stock-for-stock deal, *Revlon* will not be triggered unless, through the structure of the transaction, a company with diffuse ownership is acquired by a company with a controlling stockholder.[229]  That relegation of the target's stockholders to minority status strips them of the potential for a future control premium and requires the target's directors to maximize the target's value in the transaction.  The concerns that animate *Revlon* are not implicated, however, when, after the transaction, the stock retained by the target's stockholders "stays in

---

I assume the proper calculation is 58%.  Even so, for reasons to be explained, this does not trigger *Revlon*.

[229] *Smurfit-Stone*, 2011 WL 2028076, at *12 ("[P]ure stock-for-stock transactions do not necessarily trigger *Revlon*.  If, for example, the resulting entity has a controlling stockholder or stockholder group such that the target's stockholders are relegated to minority status in the combined entity, Delaware Courts have found a change of control would occur for *Revlon* purposes."); *see also* Laura Bower Braunsberg, *Asking the Right Question: The Mixed Consideration Denominator Problem*, 40 Del. J. Corp. L. 989, 1000–01 (2016) ("Braunsberg") ("When the acquiring company uses its shares that trade in a 'large, fluid, changeable and changing market' to buy the target shares--so long as there is no controlling stockholder in the acquiring corporation--the deferential business judgment rule applies.  The court reasons that stock-for-stock exchanges are often synergistic business combinations that do not signal abandonment of the target's long-term strategy.  Therefore, the court allows the business judgment rule to apply because the business of the target corporation is not over and the stockholders' investment continues.  The most important time to apply *Revlon* scrutiny to a transaction, rather than the business judgment rule, is in an end-stage transaction in which the investors have 'no tomorrow' for their chosen investment.  When stockholders 'will forever be shut out from future profits generated by the resulting entity as well as the possibility of obtaining a control premium in a subsequent transaction,' they need recourse if the transaction is the product of an inadequate process.  On the other hand, it would be peculiar and inaccurate to dub someone an 'auctioneer' of an extinguished company when, according to Delaware law, the company and its stockholders live on." (citations omitted)).

a large, fluid, changeable and changing public market," and the stockholders have the possibility of "obtain[ing] a future control premium."[230]

Prior to the Merger, there was no controlling stockholder in the picture at Genomic; thus, its stockholders were fully able to realize a control premium at some point in the future.[231] And the Complaint offers no basis to infer that the Merger changed this dynamic. Specifically, the Complaint says nothing of Exact's capital structure after the Merger, leaving no means to infer that the stock component of the Merger compromised the Genomic stockholders' opportunity to secure a control premium for their shares in the future.[232]

Moreover, the substantial size of the stock component of the consideration flowing from the Merger reveals there was no change-of-control transaction as

---

[230] *Smurfit-Stone*, 2011 WL 2028076, at *11; *see also Synthes*, 50 A.3d at 1048 ("A change of control 'does not occur for purposes of *Revlon* where control of the corporation remains, post-merger, in a large, fluid market.'" (citation omitted)); *Santa Fe*, 669 A.2d at 71 ("Absent this factual averment, plaintiffs have failed to allege that control of Burlington and Santa Fe after the merger would not remain in a large, fluid, changeable and changing market." (citations omitted)); *Arnold*, 650 A.2d at 1290 ("[T]here is no sale or change in control when control of both companies remains in a large, fluid, changeable and changing market." (cleaned up)).

[231] *Contra Paxson*, 2001 WL 812028, at *7 (declining to apply *Revlon* where the target's controlling stockholder denied the minority an opportunity to secure a control premium).

[232] *Smurfit-Stone*, 2011 WL 2028076, at *13 ("Notably, the Court highlighted the plaintiffs' failure to describe Burlington's capital structure, which left it with little reason to doubt that control of Burlington and Santa Fe after the merger would [] remain in a large, fluid, changeable and changing market." (citing *Santa Fe*, 669 A.2d at 71) (internal quotations omitted)).

contemplated by *Revlon*. A brief survey of analogous cases makes the point. For example, in *In re Santa Fe Pacific Corp.*, our Supreme Court declined to apply *Revlon* where stock comprised 66% of the consideration in a mixed cash/stock transaction since the control of the combined entity following the merger would remain "in a large, fluid, changeable and changing market."[233] In reaching this holding, the Court observed, "[c]onspicuoulsy absent from the complaint is a description of the stock ownership structure of [the buyer]."[234] Similarly, in *In re Synthes, Inc.*, this court found that *Revlon* was not implicated because "the Merger consideration consists of a mix of 65% stock and 35% cash, with the stock portion being stock in a company whose shares are held in [a] large, fluid market."[235] And there again, the court took note of the fact that the complaint at issue pled no facts upon which the court could draw inferences regarding the capital structure of the acquirer such that a determination could be made regarding whether "the stock portion of [the] consideration was in a controlled company."[236]

On the other hand, in *In re Smurfit-Stone Container Corp.*, this court applied *Revlon* where the consideration mix was 50/50 because, the court concluded, "there

---

[233] *Santa Fe*, 669 A.2d at 71.

[234] *Id.*

[235] *Synthes*, 50 A.3d at 1048.

[236] *Id.*

is no 'tomorrow' for approximately 50% of each stockholder's investment in Smurfit–Stone."[237]   Likewise, in *In Re Lukens Inc. Shareholders Litigation*, this court applied *Revlon* where 62% or the merger consideration was comprised of cash because, again, "for a substantial majority of the then-current shareholders, 'there is no long run.'"[238]

---

[237] *Smurfit-Stone*, 2011 WL 2028076, at *14.

[238] *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 732 n.25 (Del. Ch. 1999), *aff'd sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000) (quoting *TW Servs., Inc. v. SWT Acq. Corp.*, 1989 WL 20290, at *7 (Del. Ch. Mar. 2, 1989)).   I note there are interesting observations within the academy concerning both where our law stands now, and where it should stand, regarding the application of *Revlon* to mixed consideration transactions.  *See, e.g.*, Braunsberg, 40 Del. J. Corp. L. at 1011 (arguing that all cash transactions typically inure to the benefit of stockholders and observing that "directors' personal incentive to avoid [*Revlon* scrutiny by agreeing to more stock consideration] . . . runs counter to the stockholders' interest in gaining the best price readily available" in a landscape where director conduct is examined under enhanced *Revlon* scrutiny only in transactions where the directors extract more cash than stock as consideration); *id*. at 1011–12 (proposing that when considering whether *Revlon* should apply to a mixed consideration transaction, the court should compare the market value of the acquirer's stock paid in the transaction to the market value of the target's stock surrendered in the transaction); Matthew D. Cain et al., *Does Revlon Matter? An Empirical and Theoretical Study*, 108 Cal. L. Rev. 1683, 1725 (2020) (conducting an empirical study, maintaining as an assumption that to be classified as a *Revlon* transaction, "the consideration paid in the transaction must have consisted of at least 50% cash"); Mohsen Manesh, *Defined by Dictum: The Geography of Revlon-Land in Cash and Mixed Consideration Transactions*, 59 Vill. L. Rev. 1, 5, 18 (2014) (maintaining that decisions of this court addressing the application of *Revlon* to mixed consideration transactions, including *Lukens* and *Smurfit-Stone*, do so only in *dicta* after observing that, as the Court has done here, both courts held that the outcome of the cases would be no different even if *Revlon* did express the applicable standard of review).  The observations, while often suasive, ultimately do not influence the outcome here.  Our Supreme Court has spoken on the subject. *Santa Fe*, 669 A.2d at 71 (holding that *Revlon* did not apply to a mixed consideration transaction).

In this case, as of the Merger's closing, there most certainly was a "tomorrow" with respect to a "substantial majority" of the consideration to be paid to Genomic's shareholders—58% at a minimum.[239] And Plaintiff has pled nothing about Exact's capital structure to undermine or even add nuance to that conclusion.[240] To be clear, unlike in *Lukens*, where a majority of the stockholders could have elected to cash out their positions entirely, the consideration mix agreed to in the Merger Agreement dictates that 58% of each Genomic stockholder's shares would be converted into Exact stock.[241] Ultimately, it cannot be said that Genomic abandoned its long-term strategy, triggering a duty to maximize short-term gain, where 100% of Genomic's stockholders received Exact stock in exchange for 58% of their shares.[242] Because Plaintiff has failed to plead that Exact does not trade in a "a large, fluid, changeable and changing market" such that Genomic's stockholders were prevented from

---

[239] *Contra Lukens*, 757 A.2d at 732 n.25 ("Whether 62% or 100% of the consideration was to be in cash, the directors were obliged to take reasonable steps to ensure that the shareholders received the best price available because, in any event, for a substantial majority of the then-current shareholders, 'there is no long run.'" (citation omitted)).

[240] *Santa Fe*, 669 A.2d at 71 (discussing the lack of factual allegations regarding the acquiror's capital structure as being dispositive at the pleading stage).

[241] *Lukens*, 757 A.2d at 725 ("[E]ach Lukens shareholder would have the right to elect to receive the consideration in cash, subject to a maximum total cash payout equal to 62% of the total consideration.").

[242] Braunsberg, 40 Del. J. Corp. L. at 1000 (observing that the judicially professed reason stock-for-stock transactions fail to trigger *Revlon* is because they "do not signal abandonment of the target's long-term strategy," but rather reveal that "the stockholders' investment continues").

obtaining a control premium for their shares in future transactions following the Merger, there is no reason to apply *Revlon* under the Court's holding in *Santa Fe*.[243]

### b. Plaintiff Has Not Stated a Viable Claim Under *Revlon*

In the event *Revlon* applies, the Individual Defendants' fiduciary duties required them to act reasonably to obtain the best value reasonably available to stockholders.[244] As mentioned, however, given the exculpatory clause in Genomic's charter, Plaintiff must plead a non-exculpated claim of breach of fiduciary duty.[245]

---

[243] Plaintiff argues that because Genomic stockholders maintain only a 10.4% equity stake in post-merger Exact, they can only obtain a mere fraction of a future control premium in the event Exact is sold at a later date. AB at 62. This court already addressed and rejected this precise argument in *In Re Synthes*, finding that the proper focus is the mix of pre-merger consideration rather than the target stockholder's post-merger stake. 50 A.3d at 1047 (noting that, notwithstanding the fact that the target shareholders would only own 7% of the post-merger entity, because the merger consideration was comprised of 65% stock and 35% cash, *Revlon* did not apply). With that said, like Vice Chancellor Parsons in *Smurfit-Stone*, I acknowledge that, since "the Supreme Court has not yet established a bright line rule for what percentage of merger consideration could be cash without triggering *Revlon*," the Court's determination that *Revlon* is inapplicable here is not "free from doubt." 2011 WL 2028076, at *13. Thus, while I am satisfied, for reasons explained, that *Revlon* does not apply to this particular mixed consideration transaction under *Santa Fe*, I continue the analysis on the assumption that *Revlon* review has been triggered.

[244] *See Revlon*, 506 A.2d at 184; *Malpiede*, 780 A.2d at 1083–84 ("*Revlon* neither creates a new type of fiduciary duty in the sale-of-control context nor alters the nature of the fiduciary duties that generally apply. Rather, *Revlon* emphasizes that the board must perform its fiduciary duties in the service of a specific objective: maximizing the sale price of the enterprise. Although the *Revlon* doctrine imposes enhanced judicial scrutiny of certain transactions involving a sale of control, it does not eliminate the requirement that plaintiffs plead sufficient facts to support the underlying claims for . . . breach of fiduciary duties in conducting the sale.").

[245] *See Presidio*, 251 A.3d at 253 ("Even when a higher standard of review like enhanced scrutiny or entire fairness applies, a plaintiff can recover monetary damages for a breach

65

"[T]his means that the defendant directors are entitled to dismissal unless the plaintiffs have pled facts that, if true, support the conclusion that the defendant directors failed to secure the highest attainable value as a result of their own bad faith or otherwise disloyal conduct."[246] The "otherwise disloyal conduct" includes when a director "harbor[s] self-interest adverse to the stockholders' interests, [or acts] to advance the self-interest of an interested party from whom they could not be presumed to act independently . . . ."[247]

I have already found the Complaint fails to well plead that the Baker Brothers Entities were conflicted controllers with respect to the Merger. The only remaining conflict that might implicate a duty of loyalty breach is the allegation that Popovits lacked independence from Exact such that other Board members' allegiance to Popovits might have compromised their loyalty to stockholders. These allegations fall well short of the mark.

According to the Complaint, Popovits and Conroy had a material relationship, undisclosed to the Board, as evidenced by the facts that Popovits and Conroy grew

of the duty of loyalty [in the face of an exculpatory charter provision] only by proving that the fiduciary harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party . . . , or [otherwise] acted in bad faith." (internal quotations omitted)).

[246] *McMillan v. Intercargo Corp.,* 768 A.2d 492, 502 (Del. Ch. 2000).

[247] *Cornerstone*, 115 A.3d at 1179–80.

66

up five minutes apart in Flint, Michigan and both attended Michigan State University.[248]  As noted, these allegations fail to support even an inference that Popovits and Conroy knew each other prior to the Merger negotiations, much less that they maintained the kind of "thick[] relationship" that would justify an inference that Popovits' presumptive independence and loyalty to Genomic stockholders was overcome by her allegiance to Conroy.[249]  In the absence of well pled allegations that Popovits was conflicted with respect to the Merger, the nature of the relationships between Popovits and other Board members is irrelevant to the fiduciary duty analysis.

---

[248] Compl. ¶ 145.  In this regard, I take judicial notice of the fact that the greater metropolitan area of Flint, Michigan has a population of roughly 400,000 according to the United States Census Bureau.  www.census.gov (last visited Aug. 12, 2021).  Michigan State University has a total enrollment of more than 50,000 students.  www.msu.edu (last visited Aug. 12, 2021).  While the numbers may have been less when Popovits and Conroy grew up in Flint and attended Michigan State, the point is that it is not reasonable to infer a relationship between the two by virtue of their mere presence in densely populated locations at the same time (assuming they were present in these locations at the same time, a fact the Complaint also fails to clarify).  Yet, the facts that both resided in Flint and attended Michigan State are the only "facts" alleged to support the conclusory statement that "Popovits and Conroy have long known each other."  Compl. ¶ 64.

[249] *See Sanchez*, 124 A.3d at 1024 (describing the "thickness of the relationship" between a fiduciary and interested party that would justify questioning the fiduciary's independence); *Kahn v. M&F Worldwide*, 88 A.3d at 649 (noting that allegations of traveling in the same social circles or being friendly is not enough to overcome a director's presumption of independence).  Notwithstanding its lack of factual context, I have accepted as true that Popovits and Conroy had "long known each other" when Merger negotiations began.  I have rejected, however, any inference that this compromised Popovits' independence.

Having failed to plead a reasonably conceivable basis to question the loyalty of the Genomic directors, Plaintiff is left to argue that it is reasonably conceivable the Board failed to obtain the best value available for shareholders *in bad faith*. This requires well-pled allegations that support an inference the Board "intentionally fail[ed] to act in the face of a known duty to act, demonstrating a conscious disregard for [their] duties."[250] In other words, Plaintiff must well plead that the Board's actions were "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[251] As this court has vividly explained, the complaint that well pleads bad faith "is a [rare bird]."[252]

This Complaint does not approach "rare bird" status. Rather, the Complaint describes a robust process where the Board directed its financial advisor to conduct an extensive market check in 2017, resulting in contacts with at least 27 separate potential buyers.[253] When that process did not yield a *bona fide* suitor, the Board was content to return to managing Genomic in the ordinary course. That changed in in June 2019 when Exact made an unsolicited acquisition proposal, which prompted

---

[250] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006) (citation omitted).

[251] *In re BJ's Wholesale Club, Inc. S'holders Litig.*, 2013 WL 396202, at *7 (Del. Ch. Jan. 31, 2013) (citation omitted).

[252] *In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, 2016 WL 3044721, at *1 (Del. Ch. May 20, 2016).

[253] Compl. ¶ 56.

a fulsome negotiation leading to a fully arms-length transaction.[254] That transaction was approved by a disinterested Board, with guidance from disinterested financial and legal advisors, and then an overwhelming majority of disinterested stockholders.[255]

Plaintiff's attempt to conjure inferences of bad faith fails at every turn. *First*, she argues the Board failed to oversee and manage Popovits' conflicts with Exact's CEO, Conroy.[256] As discussed, there was no conflict to oversee.

*Second*, she argues the Board failed to oversee Goldman's conflicts with the Baker Brothers Entities.[257] In this regard, Plaintiff points to the alleged historical relationship between the Baker Brothers Entities and Goldman as support for the contention that Goldman was conflicted.[258] The Baker Brothers Entities were not conflicted, however, so their past interaction with any particular advisor is of no consequence.

---

[254] Compl. ¶¶ 64–90 (detailing the back-and-forth negotiations).

[255] Compl. ¶ 90 (explaining Sullivan & Cromwell's involvement with the process); Compl. ¶¶ 80–87 (discussing Goldman's involvement); Compl. ¶ 106 (noting the full Board's approval of the Merger); Genomic OB, Ex. 18 (noting the approval of 79.40% of the stockholders unaffiliated with the Baker Brothers Entities).

[256] AB at 64.

[257] AB at 64–65.

[258] Compl. ¶ 55.

*Third*, Plaintiff points to Goldman's alleged conflict arising from its ongoing relationship with Exact. Citing to the conflicts letter Goldman delivered to the Board on July 17, 2019, the Complaint alleges a key member of the Goldman team advising the Board, Bartosz Ostenda, was also "a member of the Investment Banking Division team serving Exact Sciences" who "may have worked and may in the future work on undisclosed but unrelated assignments [for Exact]."[259] This, according to Plaintiff, illustrates that Ostenda specifically, and Goldman generally, were actively representing Exact throughout the process leading to the Merger.[260]

As Defendants point out, the very same letter on which Plaintiff rests her argument that Goldman was incurably conflicted also assured the Board that Ostenda "will not work with Exact Sciences while the Company and Exact Sciences are in active discussions with respect to a Transaction [with Genomic]" and, perhaps most importantly, revealed to the Board that in the two years immediately preceding the July 17 letter, the "Investment Banking Division" had "not performed any financial advisory and/or underwriting services for [Exact]."[261] Because the Complaint does not support a reasonable inference that Goldman was unable to

---

[259] Compl. ¶ 92; Goldman Conflicts Letter.

[260] Compl. ¶¶ 92–93. I note that this alleged conflict was disclosed to the Board well in advance of its final decision to approve the Merger. Compl. ¶ 98.

[261] Goldman Conflicts Letter.

70

deliver independent financial advice to the Board, the Board's decision to retain Goldman and rely on its expertise cannot possibly evidence that the Board "utterly failed to attempt to obtain the best sale price."[262]

*Fourth*, Plaintiff recites a laundry list of supposedly bad faith decisions related to the negotiation process, including that the Board (a) did not form a special committee, (b) engaged with only one bidder during the 2019 process, (c) failed to have outside counsel review the transaction until the Board had already verbally expressed its approval, and (d) failed to conduct any post-signing market check.[263] Even if one or all of Plaintiff's concerns reflected "an inadequate or flawed effort to carry out fiduciary duties," that still would fall well short of allowing an inference that the Board acted in conscious disregard of those duties.[264] Indeed, under *Revlon*, the Board's "failure to take any specific steps during the sale process" or follow a "single blueprint" does not even establish a violation of *Revlon* duties, much less a

---

[262] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 244 (Del. 2009); *see also* 8 *Del. C.* § 141(e) (noting that the board may rely in good faith upon the advice of advisors selected with reasonable care); *In re Formica Corp. S'holders Litig.*, 1989 WL 25812, at *11 (Del. Ch. Mar. 22, 1989) (holding the special committee was entitled to rely on valuation advice from its investment banker)); *In re Cheyenne Software, Inc. S'holders Litig.*, 1996 WL 652765, at *2 (Del. Ch. Nov. 7, 1996) (finding that the board was entitled to rely on investment banker's opinion in considering a tender offer).

[263] AB at 66.

[264] *Lyondell*, 970 A.2d at 243.

conscious disregard of those duties.[265] Yet, that is precisely the road on which

Plaintiff seeks to travel.[266]

Plaintiff's *fifth* and *sixth* attempts to expose bad faith under *Revlon* are

extrapolations from the Board's purported failures to capitalize on an increase in

---

[265] *Id.*; *C & J Energy Servs., Inc. v. City of Miami Gen. Empls.' & Sanitation Empls.' Ret. Tr.*, 107 A.3d 1049, 1067 (Del. 2014); *see also Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1374–75 (Del. 1995) ("[E]nhanced judicial scrutiny . . . is not intended to lead to a structured, mechanistic, mathematical exercise . . . [it is] a flexible paradigm that jurists can apply to the myriad of 'fact scenarios' that confront corporate boards.").

[266] Even if the Court were to entertain the notion that the supposed process failures identified by Plaintiff might lead to an inference of bad faith, when considered on their merits, the criticisms fall flat. There was no need for a special committee because no Board member was interested or lacked independence. *See In re Plains Expl. & Prod. Co. S'holder Litig.*, 2013 WL 1909124, at *5 (Del. Ch. May 9, 2013) ("The formation of a special committee can serve as 'powerful evidence of fair dealing,' but it is not necessary every time a board makes a decision." (citation omitted)); Elizabeth Pollman, *Strengthening Special Committees*, 9 U.C. Davis Bus. L.J. 137, 141 (2009) (noting a special committee is required and useful only when "certain directors have a real or perceived conflict of interest"). The fact the Board focused on only one bidder in 2019 is not problematic given the thorough market check it conducted in 2017 and the fact that circumstances at the Company had not materially changed from 2017 to 2019. *See* Compl. ¶¶ 56, 64; *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1286 (Del. 1989) ("*Revlon* does not demand that every change in the control of a Delaware corporation be preceded by a heated bidding contest."). The delay in engaging Sullivan & Cromwell is likewise no basis for criticism. Compl. ¶ 88. S&C was available to advise the Board before it committed to the Merger, and available to advise the Board when it recommended the Merger to stockholders. Compl. ¶¶ 89–90, 106. Finally, the criticism of the Board for failing to perform a post-signing market check ignores the 2017 market check and wrongly assumes that the Board was obliged "to employ a specific device such as [an] auction or market check mechanism." *Herd v. Major Realty Corp.*, 1990 WL 212307, at *9 (Del. Ch. Dec. 21, 1990) (citation omitted); *see also Smurfit-Stone*, 2011 WL 2028076, at *18 (holding that a board does not violate fiduciary duties simply by failing to perform a market check); *Paramount*, 637 A.2d at 45 ("If a board selected one of several reasonable alternatives, a court should not second-guess that choice even though it might have decided otherwise or subsequent events may have cast doubt on the board's determination.").

72

Genomic's value during negotiations and its ultimate commitment to sell the Company at an allegedly inadequate price.[267]  Again, these reflect mere disagreements with how the Board negotiated the Merger; neither allows an inference of bad faith conduct.[268]  In the end, Exact determined to "honor the original terms of the collar and all other legal matters" in the interest of "moving to expedient resolution."[269]  Exact's decision to cave on certain terms puts a finer point on the

---

[267] AB 67–68.

[268] *Crimson*, 2014 WL 5449419, at *23 ("Mere disagreement with the Board's ultimate decision to enter into a merger, rather than proceed as a stand-alone company, however, does not show bad faith by the Board members."); *Brehm*, 746 A.2d at 266 ("But where, as here, there is no reasonable doubt as to the disinterest of or absence of fraud by the Board, mere disagreement cannot serve as grounds for imposing liability based on alleged breaches of fiduciary duty and waste." (citation omitted)).  As revealed in the Complaint, the Merger process lasted six weeks during which the two companies engaged in a vigorous back-and-forth on price and other material deal terms with the advice of highly experienced financial and legal advisors.  Compl. ¶ 64 (describing the start of merger talks on June 11, 2019); Compl. ¶ 70 (discussing the first Board meeting regarding the Merger); Compl. ¶¶ 70–75 (describing multiple offers, counter offers and rejections between Genomic and Exact); Compl. ¶¶ 80–87 (discussing Goldman's constant communication with Genomic throughout the process); Compl. ¶¶ 88–90 (discussing the engagement of outside legal counsel).  As an accent to her inadequate price argument, Plaintiff complains that the Board's failure to negotiate an appropriate collar led to the inadequacy of the price.  *See* Compl. ¶¶ 82, 87 (alleging the negotiation of the collar was uninformed and unreasonable); Compl. ¶¶ 122, 124 (alleging the final Merger consideration of $83.66 was below the negotiated collar of $97.28).  I note that this argument is not at all fleshed out in Plaintiff's brief.  But even assuming the collar did have a negative effect on the price, the Complaint's allegations in this regard hardly evidence bad faith.  *In re NYMEX S'holder Litig.*, 2009 WL 3206051, at *8 (Del. Ch. Sept. 30, 2009) (finding that a board's decision to omit a collar while negotiating various merger terms does not rise to the level of even gross negligence).

[269] Compl. ¶ 105.

Board's ability to extract value from Exact.[270]  Contrary to Plaintiff's proffered narrative, the Complaint does not well plead a tainted negotiation process that resulted in a demonstrably bad deal on its face.  Indeed, the Complaint acknowledges the Board extracted a 5% premium over Genomic's then current trading price at the time the Merger Agreement was signed, a price that certainly was not "beyond the bounds of reasonable judgment [such that] it seems inexplicable on any ground other than bad faith."[271]

### 3. No Bad Faith Disclosure Violation

When obliged by law to disclose, a director's fiduciary duties require that she "disclose fully and fairly all material information within [her] control."[272]  As with her *Revlon* claim, Plaintiff's "claims alleging disclosure violations that do not otherwise fall within any exception are protected by Section 102(b)(7) . . . ."[273]  And, again, because Plaintiff has not well pled that any fiduciary was interested or lacked independence, she is, again, obliged to well plead that the Genomic fiduciaries

---

[270] *Id.*

[271] *Crimson*, 2014 WL 5449419, at *23 (citation omitted) (holding that a 7.7% premium did not evidence bad faith).

[272] *In re Solera Hldgs., Inc. S'holder Litig.*, 2017 WL 57839, at *9 (Del. Ch. Jan. 5, 2017) (citation omitted).

[273] *Arnold*, 650 A.2d at 1287.

"knowingly or deliberately failed to disclose facts they knew were material."[274] In other words, Plaintiff must well plead bad faith.

In her effort to meet this pleading burden, Plaintiff begins by alleging that the Board failed to disclose in the Proxy material information regarding its advisors.[275] According to the Complaint, the Proxy failed to disclose why Goldman was retained, Goldman's prior relationship with the Baker Brothers Entities, Goldman's alleged conflicts with Exact and the reason Sullivan & Cromwell was retained given that Genomic already had legal advisors.[276]

The question of why Goldman was retained can readily be ascertained from the Proxy, namely, because of its long-standing relationship with Genomic and its extensive M&A experience.[277] Any argument suggesting that the Board retained Goldman based on alleged conflicts is, as already explained, not born out by the pled facts. As for the retention of Sullivan & Cromwell, it is hard to discern the

---

[274] *Id.* at 1288.

[275] Compl. ¶ 137; AB at 69–70.

[276] Compl. ¶¶ 137–142.

[277] Compl. ¶ 137; *see also Cty. of York Empls. Ret. Plan v. Merrill Lynch & Co.*, 2008 WL 4824053, at *10 (Del. Ch. Oct. 28, 2008) (finding the lack of a colorable duty of disclosure violation where the proxy detailed the company's rationale for retaining a particular financial advisor, based principally on a long-standing relationship).

materiality of Genomic's decision to retain S&C when it did.[278]  Even assuming

materiality, however, the Complaint pleads no basis to infer that the Board

"knowingly or deliberately" kept this information from Genomic stockholders

knowing that it was material or for self-interested reasons.

The same is true for the remainder of Plaintiff's disclosure claims.  For

instance, the fact the Proxy did not provide every detail about the Board's alleged

July 9 verbal agreement on price does not suggest the Board intentionally omitted

this information even though it was material.[279]  As for Plaintiff's contention that the

Proxy failed to disclose "the pretextual reasons why Exact Sciences refused to

provide its multi-year projections," notwithstanding the Board's demand that Exact

---

[278] *In re Merge Healthcare Inc.*, 2017 WL 395981, at *13 (Del. Ch. Jan. 30, 2017) ("[D]isclosures relating to the Board's subjective motivation or opinions are not *per se* material, as long as the Board fully and accurately discloses the facts material to the transaction.  Put more simply, [a]sking 'why' does not state a meritorious disclosure claim under our law." (cleaned up)); *Repairman's Serv. Corp. v. Nat'l Intergroup, Inc.*, 1985 WL 11540, at *8 (Del. Ch. Mar. 15, 1985) ("[W]here arm's-length negotiation has resulted in an agreement which fully expresses the terms essential to an understanding by shareholders of the impact of the merger, it is not necessary to describe all [] the bends and turns in the road which led to that result" (citation omitted)).

[279] Compl. ¶¶ 143–44. In this regard, I agree with Defendants that Plaintiff's argument is playing semantics.  The Proxy itself discloses the July 9 verbal agreement, explaining that the Board "instructed Ms. Popovits and representatives of Goldman [] to communicate to Exact [] that a transaction of $72.00 per share, with a cash component of $27.50 and a 10% two-way collar mechanism, would be acceptable."  Proxy at 50.  It is unclear what other information would "alter the total mix of information" already available to stockholders. *Wayne Cty. Empls.' Ret. Sys. v. Corti*, 954 A.2d 319, 323 (Del. Ch. 2008).

76

provide this financial information,[280] there was no need for this disclosure when the Proxy made clear that Exact does "not, as a matter of course, make long-term projections as to future performance available to the public . . . ."[281]  Based on this practice, the Proxy disclosed that Exact did not furnish to Genomic "any non-public prospective financial information regarding Exact [], other than with respect to Exact['s] [] second quarter 2019 financial results and increased revenue guidance for 2019."[282]  With these disclosures in hand, Genomic stockholders understood that Exact would not and did not provide certain projections and that, notwithstanding the lack of these projections, the Board decided to proceed with the Merger.  Again, it is hard to see where the disclosure fell short; it is even harder to see where the failure to disclose amounted to bad faith.[283]

---

[280] Compl. ¶ 147.

[281] Proxy at 71.

[282] *Id.*

[283] Plaintiff makes two more arguments regarding alleged disclosure violations, both of which I have already addressed.  First, she argues the Proxy does not contain information related to the relationship between Popovits and Conroy.  Compl. ¶ 145.  As discussed above, nothing in the Complaint allows an inference that there was anything there to disclose.  Second, she argues the timing of the Voting Agreement between the Baker Brothers Entities and Exact was not disclosed.  Compl. ¶ 148.  Because I have determined that no agreement occurred between the Baker Brothers Entities and Exact until after Genomic and Exact signed the Merger Agreement, and because the fact of the final Voting Agreement was fully disclosed, again, there was nothing to disclose.  *See* Proxy at 57 ("Late in the evening on July 28, Genomic Health and Exact Sciences executed the merger agreement and Exact Sciences and the [Baker Brothers Entities] executed the voting agreement.").

77

Given Plaintiff's failure to justify the application of either entire fairness or *Revlon* as the appropriate standards of review, the business judgment presumption applies.[284] "When a plaintiff fails to rebut the presumption of the business judgment rule, she is not entitled to any remedy, be it legal or equitable, unless the transaction constitutes waste."[285] The Complaint does not purport to plead a claim for waste, and so Plaintiff's claims against each director must be dismissed.

## D. The Fiduciary Duty Claims Against Popovits as a Genomic Officer

While Section 102(b)(7) exculpates each Genomic director from monetary liability associated with duty of care claims, including Popovits in her capacity as a director, that exculpation does not extend to corporate officers.[286] Plaintiff may well plead either a breach of the duty of care or loyalty to overcome Popovits' motion to dismiss.

---

[284] Having determined that dismissal is required on other grounds, I do not address whether and to what extent the *Corwin* doctrine "cleanses" any potential fiduciary duty violations. *Corwin,* 125 A.3d at 312.

[285] *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 747 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) (citation omitted).

[286] *Gantler v. Stephens*, 965 A.2d 695, 709 n.37 (Del. 2009) ("Although legislatively possible, there currently is no statutory provision authorizing comparable exculpation of corporate officers.").

A corporate officer breaches the duty of loyalty just as a director does—by acting out of self-interest to the detriment of stockholders or by acting in bad faith.[287] "To plead a care-based damages claim against a non-exculpated fiduciary, the plaintiff must plead facts supporting a reasonable inference that the defendant acted with gross negligence."[288] "Gross negligence involves more than simple carelessness. To plead gross negligence, a plaintiff must allege 'conduct that constitutes reckless indifference or actions that are without the bounds of reason.'"[289] "'Because fiduciaries . . . must take risks and make difficult decisions about what is material to disclose, they are exposed to liability for breach of fiduciary duty only if their breach of the duty of care is extreme.'"[290]

Plaintiff makes two arguments regarding Popovits' alleged conflicts, neither of which creates a reasonable inference that she violated her duty of loyalty. First, in predictable fashion, Plaintiff points once again to the supposed "longstanding ties" between Conroy and Popovits going back to their days living five minutes apart in

[287] *Id.* at 709 ("[W]e have implied that officers of Delaware corporations, like directors, owe fiduciary duties of care and loyalty, and that the fiduciary duties of officers are the same as those of directors." (citations omitted)).

[288] *Presidio*, 251 A.3d at 254 (citations omitted).

[289] *In re Baker Hughes Inc. Merger Litig.*, 2020 WL 6281427, at *15 (Del. Ch. Oct. 27, 2020) (quoting *Morrison v. Berry*, 2019 WL 7369431, at *22 (Del. Ch. Dec. 31, 2019)).

[290] *Morrison*, 2019 WL 7369431, at *25 (quoting *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 157 (Del. Ch. 2004)).

Flint, Michigan and their days attending Michigan State University at the same time.[291] As mentioned, at the very best for Plaintiff, she has alleged that the two CEOs knew each other. That, alone, does not, and cannot, fuel a loyalty breach claim.

Second, Plaintiff alleges that Popovits was improperly incentivized to close the Merger quickly so she could exit the Company with a $13.4 million golden parachute.[292] In *Morrison v. Berry*, this court found an exclusive compensation benefit to an executive did not implicate that executive's fiduciary duties where the benefit was not tied to a specific buyer and did not uniquely incentivize a sale at an unfair price.[293] Likewise, Popovits' compensation was not tied to a deal with Exact exclusively and the Complaint does not plead facts suggesting the compensation misaligned Popovits' interests with those of Genomic's stockholders.[294]

---

[291] Compl. ¶¶ 145, 177.

[292] Compl. ¶ 178.

[293] 2019 WL 7369431, at *22 ("The change-in-control benefit was not exclusive to a purchase by Apollo, I note, and would not predispose Duggan to encourage a sale to Apollo exclusively, nor a sale at an unfair price.").

[294] *In re Novell, Inc. S'holder Litig.*, 2013 WL 322560, at *11 (Del. Ch. Jan. 3, 2013) ("[T]he possibility of receiving change-in-control benefits pursuant to pre-existing employment agreements does not create a disqualifying interest as a matter of law."). *Contra In re Xura, Inc., S'holder Litig.*, 2018 WL 6498677, at *13 (Del. Ch. Dec. 10, 2018) (finding a well-pled breach of fiduciary duty claim where a CEO pushed through a merger notwithstanding a promise of continued employment post-merger "in the face of his looming termination from" the pre-merger entity); *id* at *11 (finding a breach of fiduciary

Accordingly, the Complaint does not state a viable claim that Popovits breached her duty of loyalty.

Plaintiff's allegations against Popovits' for breaches of her duty of care fare no better. These claims rest on allegations that Popovits negotiated the Merger without Board knowledge or authorization. Specifically, the Complaint alleges that Popovits engaged in negotiations with Conroy, including having signed an NDA and discussing price, without apprising any Genomic director of her moves other than Julian Baker.[295] For example, on June 13, two days after Conroy approached Popovits regarding a transaction, Conroy submitted a non-binding proposal to Popovits and Popovits immediately contacted Goldman to seek its advice on the potential transaction.[296] And the day after the Board rejected Exact's initial offer, the Complaint alleges that Popovits, without authorization, discussed due diligence with Exact.[297]

Plaintiff's attempt to cast Popovits as a rogue CEO amounts to much ado about very little. The Board was advised of Popovits' initial discussions with

---

duty claim well pled against an officer where "Xura was steered into the Transaction by a fiduciary who had an interest different from shareholders, namely self-preservation").

[295] Compl. ¶¶ 65–69.

[296] Compl. ¶ 67.

[297] Compl. ¶ 71.

Conroy and her engagement of Goldman no later than June 17.[298] And the Complaint acknowledges that, as of at least June 24, Popovits had informed the Board about her ongoing negotiations and exchanges of diligence with Exact.[299] Yet the Complaint alleges no facts that would support an inference the Board was either upset or surprised by the revelation. Nothing about Popovits' conduct, up to this point, supports a reasonable inference that she acted with "reckless indifference" or "outside the bounds of reason."[300]

Plaintiff's final attempt to support a duty of care claim relates to Popovits' supposed effort, "after Genomic's stock price shot up, . . . [to] push[] the Board to a quick close because of Genomic's valuation."[301] That is not what the Complaint actually alleges, however. According to the Complaint, Conroy informed Popovits on July 26 that Exact wished to close quickly and, consistent with her duty of candor, Popovits informed the Board that Exact had a "heightened sense of urgency" to

---

[298] Compl. ¶ 70 ("At a June 17, 2019 Board meeting, after reviewing the June 13 Proposal, the Board concluded that Exact Sciences needed to offer more cash given that Exact Sciences' current stock price was trading at a historically high level." (internal quotations omitted)).

[299] Compl. ¶ 72. Popovits followed this revelation with a full presentation to the Board regarding the status of negotiations on June 26. Compl. ¶ 75.

[300] *Baker Hughes*, 2020 WL 6281427, at *15; *Morrison*, 2019 WL 7369431, at *24.

[301] AB at 78.

execute the Merger Agreement.[302]  And it was the Board's response to this sense of urgency that prompted Exact to "honor the original terms of the collar and other legal matters," decisions that clearly worked to the benefit of Genomic and its stockholders.[303]

Even after giving all reasonable inferences to Plaintiff, I cannot conclude she has well pled a breach of the duty of care claim against Popovits.  As revealed in the Complaint, Popovits was a disinterested, engaged negotiator throughout the process and kept the Board reasonably apprised of her progress.  When the time came to approve the Merger, the Board was able to do so on an informed basis thanks, in part, to the work of the Company's CEO.

## E. Aiding and Abetting

Plaintiff alleges Exact and Goldman aided and abetted the Baker Brothers Entities and the Individual Defendants in their breaches of fiduciary duty.[304]  To well plead an aiding and abetting claim, "the complaint must allege facts that satisfy the four elements of an aiding and abetting claim: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, (3) knowing participation in that

---

[302] Compl. ¶ 102.

[303] Compl. ¶ 105.

[304] Compl. ¶¶ 187–96.

breach by the defendants, and (4) damages proximately caused by the breach."[305] Because the Complaint fails to well plead a breach of fiduciary duty claim against any of the Company's fiduciaries, Plaintiff's claims for aiding and abetting a breach of fiduciary duty likewise fail as a matter of law.[306]

## III.   CONCLUSION

For the foregoing reasons, each of the Defendants' motions to dismiss must be GRANTED.

**IT IS SO ORDERED.**

---

[305] *Malpiede*, 780 A.2d at 1096 (cleaned up).

[306] *See, e.g.*, *KKR*, 101 A.3d at 1003 ("An aiding and abetting claim 'may be summarily dismissed based upon the failure of the breach of fiduciary duty claims against the director defendants.'" (citation omitted)).